[Cite as *In re S/F Children*, 2025-Ohio-822.]

# IN THE COURT OF APPEALS
## FIRST APPELLATE DISTRICT OF OHIO
## HAMILTON COUNTY, OHIO


| | | | | |
|---|---|---|---|---|
| IN RE: S/F CHILDREN | : | APPEAL NOS. | C-240651 | |
| | | | C-240676 | |
| | : | TRIAL NO. | F/19/1339 X | |
| | : | | | |
| | : | *O P I N I O N* | | |


Appeals From: Hamilton County Juvenile Court

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: March 12, 2025


*Jeffrey J. Cutcher*, for Appellant Mother,

*Alana Van Gundy*, for Appellant Father,

*Connie Pillich*, Hamilton County Prosecuting Attorney, and *Thomas Koopman,* Assistant Prosecuting Attorney, for Appellee Hamilton County Department of Job and Family Services,

*Raymond T. Faller*, Hamilton County Public Defender, and *Mary M. Salyer*, Assistant Public Defender, for Appellee Guardian ad Litem.

**CROUSE, Judge.**

**{¶1}** In these consolidated appeals, mother and father challenge the judgment of the Hamilton County Juvenile Court granting permanent custody of their seven children to the Hamilton County Department of Job and Family Services ("the Agency"). Concerns of ongoing domestic violence between mother and father motivated the Agency's initial intervention. After five years of back-and-forth custody and ongoing incidents, the juvenile court concluded that mother and father had failed to remedy these domestic-violence concerns and granted the Agency's permanent-custody petition. For the reasons outlined below, we affirm the judgment of the juvenile court.

## I.  BACKGROUND

**{¶2}** We begin by noting that, at the time of the decision below, mother and father had seven children, all of whose first names began with "J" and whose last names began with "S" or "F." We therefore include their middle initials and, where necessary, numbers, to identify them. A list of the children, along with their ages at the time of the magistrate's decision, is as follows: JWS (8 years old), JLF1 (7 years old), JDS (5 years old), JSF (4 years old), JLF2 (2 years, 11 months old), JAF (2 years old), and JMF (1 year old).

### A.  The Children & the Custody Proceedings

**{¶3}** The Agency first became involved with the S/F family in 2019, when only the eldest three children—JWS, JLF1, and JDS—were born. While mother was driving father and the children in her car, father allegedly punched mother in the face, causing the car to crash. Father was charged with child endangerment, but the charges were dismissed for failure to prosecute.

**{¶4}** Shortly after the incident, in September 2019, the Agency stepped in and

was granted emergency custody of JWS, JLF1, and JDS. The Agency then filed a complaint seeking temporary custody of the three children. The parties agreed to an order of protective supervision and waived the 90-day window for disposition.

{¶5} In November 2019, the parties agreed to a case plan, in which the Agency said it expected mother and father to attend individual and couple's counseling, receive various domestic-violence and related parenting trainings, and learn healthy ways to communicate and avoid further domestic violence. Ultimately, the goal was to ensure that the children had a safe environment, free of domestic violence, in which to live. Two months later, father was permitted to return to the home he shared with mother.

{¶6} In May 2020, a few months after the birth of mother and father's fourth child, JSF, the Agency filed an initial complaint for temporary custody of JSF. The agency also filed an amended complaint seeking temporary custody of JWS, JLF1, and JDS, alleging that mother had thrown a cable box at father and that father had pulled out mother's hair. The court granted interim temporary custody. After a hearing in October 2020, the court adjudicated all four children dependent and granted temporary custody to the Agency.

{¶7} In May 2021, the court remanded custody of the four children to the parents with an order of protective supervision. However, within two weeks, the Agency again sought and received emergency custody of the four children based on renewed concerns about domestic violence in the home.

{¶8} A few months later, JLF2, mother and father's fifth child, was born. At that time the Agency sought emergency and temporary custody of JLF2. The court gave the Agency emergency custody. Ten months after that, JAF was born, and the same sequence of events took place.

3

{¶9} In October 2022, JWS, JLF1, JDS, JSF, and JLF2 were adjudicated dependent children and placed in the temporary custody of the Agency, due in part to ongoing domestic violence. The magistrate also granted a first extension of temporary custody with respect to the four oldest children.

{¶10} Then, in March 2023, JAF, the sixth child, was adjudicated dependent and placed in the Agency's temporary custody. A first extension of temporary custody was granted with respect to JLF2, and a second extension was granted for the four oldest children. As part of the same order, the magistrate made clear that both mother and father had completed many of the case plan services, and that the Agency was not recommending any further services to address the domestic violence specifically, but was requiring the parties continue in individual therapy. The order made clear that the "main issue of the case" continued to be "domestic violence."

{¶11} One month later, the Agency moved to make its temporary custody of the six S/F children permanent. The guardian ad litem ("GAL") supported giving permanent custody to the Agency. Because the two oldest children, JWS and JLF1, had apparently expressed some desire to remain with mother and/or father, the GAL moved to have the court appoint separate conflict-counsel to represent their interests. The magistrate granted the GAL's motion and appointed counsel.

{¶12} A few months later, mother gave birth to JMF, the seventh and youngest of the children in this case. The Agency filed a complaint alleging that JMF was a dependent child and seeking an initial disposition of permanent custody. In the meantime, the Agency received interim custody of JMF.

{¶13} In February 2024, the magistrate held an in-camera interview with the three oldest children, JWS, JLF1, and JDS, to discuss their dispositional wishes. JWS, who was then 8 years old, said she felt safest with her current foster family or with a

4

prior foster family. JLF1, then 6 years old, said she wished to live with all her sisters, but did not identify where she felt safest. JDS, then 5, said she felt safest with and wanted to live with a prior foster parent, but enjoyed visits with mother, father, and her siblings. The magistrate appointed the attorney whom she had previously chosen to represent JWS and JLF1 to represent JDS as well.

### B. Record Incidents of Domestic Violence

{¶14} The record reveals that, throughout the nearly five years of juvenile-court proceedings described above, incidents of domestic violence between mother and father persisted.

{¶15} For about two months following the incident in which father punched mother while driving, father was not permitted to be in the home he shared with mother. A few months after he was allowed to return home, while the children were living with mother and father, violence again broke out. Father alleged that mother threw a cable box at him. Mother alleged that father had pulled out her hair. This incident led the magistrate to give temporary custody of the eldest four children to the Agency.

{¶16} In May 2021, just two weeks after the magistrate had again remanded the children to mother and father's care, mother called one of the children's former foster parents to express that she did not feel safe in the home with father. According to findings by the magistrate, mother had told the foster parent that "the fighting between the parents had 'never stopped' and that the frequency and intensity of the fighting was increasing." Mother later denied making such statements, but the magistrate did not believe her. The Agency once again took emergency custody of the children.

{¶17} In January 2022, mother allegedly called 9-1-1 after getting in a verbal

argument with father while father had a knife. Mother would later claim she had made a call, but not to emergency services, and that she had not been afraid. The magistrate found her revised testimony "incredible."

**{¶18}** In November 2022, mother and father's couple's counselor terminated their counselling after concluding that the parents' outstanding individual issues prevented them from progressing as a pair. The decision may also have been precipitated by a physical altercation between mother and father during a remote therapy session involving father throwing something at mother.

**{¶19}** In May 2023, police were called to father's home. Police body-camera footage depicted mother, who was nearing the end of her pregnancy with JMF, telling officers how father had punched her in the stomach, pushed her onto the ground, kicked her, thrown things at her, and attempted to drag her by her hair. Mother's lip was visibly injured in the video. Father, in turn, reported that mother had provoked an argument, threw a video-game controller at his television, and tried to stab and bite him. The recording shows father, detained in the officers' vehicle, yelling across the parking lot at mother through the vehicle's sometimes-closed and sometimes-open window and violently kicking the inside of the car door. His exclamations included statements like, "Hope you know the kids gone for good. Thank you. Thanks to Mommy. Don't think this gonna help the damn case." Father was taken to jail, but mother did not press charges, did not fill out a victim statement, and declined to seek a protective order that included the children.

**{¶20}** About three months later, mother again became pregnant with father's child. Two months after that, father called 9-1-1 to report that his "girlfriend" had been walking around his apartment threatening him with scissors. Although the name he gave did not exactly match mother's, the date of birth father provided for the girlfriend

did.

### C. Disposition Hearing

{¶21} From February to June 2024, the magistrate held a series of hearings to resolve the Agency's motions for permanent custody of the older six children, and the agency's petition for an initial disposition of permanent custody for JMF. These hearings included testimony from, among others, one of the officers from the May 2023 incident; Abbi Rogers, the current caseworker at the Agency; Tia Hale, who had previously managed mother and father's couple's counseling; Dr. North, mother's current mental healthcare provider; facilitators from the visitation facility; the foster mother for two of the children; mother; and father.

{¶22} During the officer's testimony, the court watched the video of the May 2023 incident, which the officer narrated.

{¶23} Testimony from Dr. North suggested that mother's mental-health treatment was progressing, and that mother had maintained a stable relationship with Dr. North for over a year. Father, however, had not managed to maintain a stable mental healthcare provider for a comparable length of time.

{¶24} In addition, testimony from facilitators who worked at the facility where parents had visitation with the children revealed that these visits were generally very positive, that the parents interacted with the children well, and that the children were excited to see mother and father.

{¶25} Testimony also revealed that at least three of the children, JWS, JLF1, and JDS, suffered from trauma-related mental-health issues that had their origins in witnessing parental violence. At least two others, JAF and JMF, showed signs of developmental delay or disability that would require significant care.

{¶26} JWS (8 years old) was diagnosed with adjustment disorder with trauma

related to domestic violence she witnessed between her parents. She has completed third grade but reads at a kindergarten level.

{¶27} JLF1 (7 years old) displayed explosive and violent behaviors, including elopement, biting, and kicking. The explosive behaviors were related to post-traumatic stress disorder ("PTSD"), caused in part by witnessing domestic violence. Her challenging behaviors included swinging a baby around so that its head hit the wall at one foster home and trying to kick the window out of a caseworker's car. Because of these behaviors, JLF1 cannot participate in an ordinary academic setting, and attends a partial-hospitalization program. Mother and father have not participated in JLF1's ongoing treatment, as the caseworker expressed that such "participation would be inappropriate due to [JLF1] expressing a lot of her trauma is due to witnessing domestic violence." JLF1 went through 13 foster placements—largely because of her explosive behaviors—but, at the time of the hearing, was placed in a foster home in which she was the only child. Testimony suggested that JLF1's foster parent was open to adoption.

{¶28} JDS (5 years old) was diagnosed with adjustment disorder with trauma. JDS has resided in the same foster home since July 2022. Her foster mother testified that, prior to and after visitation with mother and father, JDS exhibited behavior issues, cried, and experienced nightmares up to four or five times a night.

{¶29} JAF (2 years old) has global developmental and cognitive delays and is being evaluated to assess whether she has an autism-spectrum disorder. Her foster mother, who testified at the hearing, has been very supportive in getting JAF to her physical-, occupational-, and speech-therapy appointments; helping JAF to develop skills at home; and accommodating JAF's special needs.

{¶30} JMF (1 year old) has failed to meet some developmental milestones and

was being assessed for early intervention.

**{¶31}** At the time of the hearing, the children had been placed with four different foster families, all of which were open to adoption: (1) JWS was placed with a foster parent to whom the magistrate found she was bonded, (2) JLF1 was the only child under the care of her foster parent, who appeared to be meeting her significant needs, (3) JDS and JAF were placed together with foster mother Melissa, who testified at trial, and (4) JSF, JLF2, and JMF were placed together in a different foster home.

**{¶32}** In July 2024, the magistrate rendered her decision granting permanent custody of all seven children to the Agency. Mother and father filed objections to that decision. The juvenile court overruled the objections and adopted the magistrate's decision as modified by the juvenile court's own lengthy analysis. Mother and father appealed.

**{¶33}** Father's brief merely states his support for an award of custody to mother. Because father's brief sets forth no assignments of error, it contains nothing for us to address in this appeal. *See* App.R. 12(A)(1)(b), 12(A)(2), and 16(A)(3). We therefore address only mother's assignments of error.

**{¶34}** Mother's brief raises two assignments of error. In her first assignment of error, mother argues that conflict-counsel appointed to represent the three older children was ineffective. In her second assignment of error, she argues that the juvenile court's conclusions lacked sufficient evidence and were against the manifest weight of the evidence. Because our consideration of mother's second assignment of error provides important context for the first, we address them out of order.

## II. SUFFICIENCY & MANIFEST WEIGHT

**{¶35}** Mother's second assignment of error contends that the juvenile court's determination was based on insufficient evidence and was against the manifest weight

9

of the evidence.

**{¶36}** The termination of parental rights is statutory and is governed by R.C. 2151.414. In general, the statutory findings in permanent-custody proceedings must be based upon "clear and convincing evidence." *See* R.C. 2151.414(B)(1) and (E). "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

**{¶37}** Sufficiency pertains, in essence, to the *burden of production*. To determine whether sufficient evidence supported a grant of permanent custody, we must assess whether the facts, record evidence, and inferences supporting the juvenile court's disposition were adequate to sustain the juvenile court's statutory determinations. *See In re A.B.*, 2015-Ohio-3247, ¶ 15 (1st Dist.). In our sufficiency review, we accept the juvenile court's underlying factual determinations if supported by competent and credible evidence. *See In re A.Y.C.*, 2023-Ohio-4494, ¶ 34 (1st Dist.).

**{¶38}** Manifest-weight challenges, by contrast, concern the *burden of persuasion. See In re A.B.* at ¶ 15. Our review of the manifest weight requires us to consider the relative weight of all the proofs and address whether the factfinder "lost its way . . . in resolving conflicts in the evidence." *In re B.J.,* 2021-Ohio-373, ¶ 14 (1st Dist.). We will reverse the juvenile court's judgment as against the manifest weight of the evidence only if, in resolving those conflicts, we determine that the factfinder has created "a manifest miscarriage of justice." *Id.*

**{¶39}** At the time of the disposition hearings, the six oldest children had already been adjudicated dependent and placed in the temporary custody of the

Agency. The youngest, JMF, had not. Because this distinction alters the statutory analysis, we address first the juvenile court's disposition of JWS, JLF1, JDS, JSF, JLF2, and JAF, before addressing its disposition of JMF.

### A. JWS, JLF1, JDS, JSF, JLF2 & JAF

**{¶40}** The Agency moved to make its temporary custody of the six oldest children permanent under R.C. 2151.413. In ruling on such a permanent-custody motion, the juvenile court must engage in a two-pronged analysis. First, it must ask whether the child is *eligible* for a permanent-custody disposition under R.C. 2151.414(B). Then, if the child is eligible, the juvenile court must determine whether a disposition of permanent custody would be in the child's *best interests* under R.C. 2151.414(D).

### 1. Eligibility (R.C. 2151.414(B) & (E))

**{¶41}** The juvenile court found the six eldest children eligible for permanent custody because they fell within the categories outlined under R.C. 2151.414(B)(1)(d), R.C. 2151.414(B)(1)(a), or both.

**{¶42}** R.C. 2151.414(B)(1)(d) sets forth a purely time-based criterion, which renders a child eligible for a permanent-custody disposition if "[t]he child has been in the temporary custody of [the Agency] for twelve or more months of a consecutive twenty-two-month period."

**{¶43}** R.C. 2151.414(B)(1)(a), by contrast, makes a child eligible for permanent custody if the child "cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents." That "cannot"/"should not" condition is in turn defined in R.C. 2151.414(E), which sets forth a list of 16 conditions, any one of which, if satisfied, would require the court to enter a cannot/should not finding.

**{¶44}** By its terms, mother's second assignment of error challenges the juvenile court's determination "that the children could not be placed with mother within a reasonable time or should not be placed with mother" under R.C. 2151.414(B)(1)(a). But, strictly speaking, this (B)(1)(a) issue is moot with respect to the five oldest children (JWS, JLF1, JDS, JSF, and JLF2). The juvenile court found that these five were eligible for permanent custody under the time-based condition in R.C. 2151.414(B)(1)(d). It then held, *in the alternative*, that "[e]ven if R.C. 2151.414(B)(1)(d) did not apply to JWS, JDS, JLF1, JLF2, and JSF, the Court is still permitted to consider an award of Permanent Custody of these Children to the Agency as R.C. 2151.414(B)(1)(a) would apply." Mother has not challenged the juvenile court's principle finding that these five children were eligible under R.C. 2151.414(B)(1)(d). Thus, even if we held that the juvenile court's cannot/should not findings under R.C. 2151.414(B)(1)(a) and (E) were erroneous, the five oldest children would remain eligible for permanent custody under R.C. 2151.414(B)(1)(d).

**{¶45}** However, the juvenile court found that mother's sixth child, JAF, did not satisfy R.C. 2151.414(B)(1)(d), as she "had not been in the Temporary Custody of the Agency for more than twelve months of a consecutive twenty-two-month period" when the Agency filed its permanent-custody motion. JAF's eligibility for a permanent-custody disposition thus rises or falls on the juvenile court's cannot/should not finding under R.C. 2151.414(B)(1)(a).

**{¶46}** The juvenile court found that the children could not or should not be placed with the parents under R.C. 2151.414(E)(1), which requires the court to make a cannot/should not finding if,

notwithstanding reasonable case planning and diligent efforts by the

agency to assist the parents to remedy the problems that initially caused

the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

{¶47} The Agency created a case plan for mother following the removal of JWS, JDS, JLF1, and JSF from the home. According to that case plan and the testimony of caseworker Abigail Rogers, the Agency was concerned about not only the presence of domestic violence in the home, but also mother's mental health and the stability of her housing and income.

{¶48} To remedy these issues, the Agency expected mother to engage in educational and assistive services, demonstrate that she can manage her anger without violence, and show that she would act to protect her children. It also expected mother to complete diagnostic assessments and engage with a mental-healthcare practitioner.

{¶49} The juvenile court concluded that, "[w]hile the record is clear that both parents have complied with services provided by the Agency, *behavioral changes are also necessary* in order for the Court to find that the parents have remedied the concerns that led to the Children's [sic] removal." (Emphasis added.) Ultimately, the court found "that the evidence presented does not support that the concern of domestic violence between the parents has been remedied," and that R.C. 2151.414(E)(1) therefore applied. It explained:

13

The presence of domestic violence in mother and father's relationship looms over this case and is difficult for the Court to forget or ignore. While mother and father contend that they can coexist peacefully and effectively coparent, the Court cannot help but be concerned that their continued proximity may result in future harm. For approximately five years, there have been varied reports of domestic violence between the parents in which one of them was at risk of significant harm. These instances have also impacted the Children as both parents testified that the Children have witnessed them fight and harm each other. Testimony was also elicited regarding the impact of this violence on the Children and their trauma.

**{¶50}** Mother does not argue that the Agency's case planning was "[un]reasonable" or that the Agency failed to engage in "diligent efforts . . . to assist the parents to remedy the problems" identified in the plan. *See* R.C. 2151.414(E)(1). She asserts that the evidence presented did not show that she had "failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home." *Id.*

### a. Sufficiency

**{¶51}** The evidence before the juvenile court was adequate to support its permanent-custody disposition. As discussed above, the record reveals a pattern of violent episodes, continuing from at least 2019, when the Agency became involved, until as late as October 2023, eight months before the dispositional hearing began. The domestic violence occurred throughout the Agency's involvement with the family. And the most concerning and heavily discussed episode (i.e., the alleged punching, kicking, and dragging of mother in May 2023) occurred roughly a year before the

14

permanent-custody hearings began, while mother and father were supposedly not living together. The five years of proceedings before the magistrate had furnished competent, credible evidence from which the court could conclude that most, if not all, of the episodes of abuse described above had occurred. For sufficiency purposes, therefore, we accept the trial court's historical findings regarding mother and father's "history of violence."

{¶52} The juvenile court's further predictive inference, that the risk of violence between father and mother persisted, was likewise grounded in competent, credible evidence of their continued or intermittent cohabitation, and on mother's persistent inability to extricate herself from father and their violence-prone relationship. Even after the May 2023 incident, and while the children were in the temporary custody of the Agency, the evidence suggests that mother continued to have a relationship with father. Indeed, three months *after* the May incident, and only one month after giving birth to JMF, the record suggests mother again became pregnant with what would have been her and father's eighth child, but she suffered a miscarriage.

{¶53} Also supported by record testimony were the juvenile court's findings that mother and father persisted in maintaining regular communication, even while all children were in custody of the Agency; that father would visit mother's home multiple times per week, again, despite the absence of the kids; and that mother regularly gave father, who has no driver's license, rides.

{¶54} The juvenile court's concern that mother continued to reside, from time to time, with father was likewise supported by record evidence. Mother had signed a 24-month lease on her own four-bedroom home in August 2023. But ample evidence suggested that this new living arrangement had not severed mother's link with father. Rogers, the caseworker, testified that when she had visited mother's home a month

after her lease began, mother had not significantly unpacked, so that "it did not appear that mother was currently residing at that address." In fact, Rogers testified that the only bed was an air-mattress that lay deflated and balled up in the closet. Rogers was concerned that mother was staying with father. Those concerns were substantiated by (1) the testimony suggesting that mother again became pregnant the very month she signed her new lease, and (2) father's 9-1-1 call, placed two months *after* the lease had begun, in which he reported violent conduct by a "girlfriend" who had mother's same birthday.

**{¶55}** Further, even if mother resided every night at her new residence, this did little to separate her from father. The juvenile court heard testimony that the two homes were so close that father's apartment building was visible from mother's porch.

**{¶56}** The juvenile court further found that mother and father had, at the time of the hearings, failed to secure a divorce. The record reveals that a prior attempted divorce had failed because mother and/or father had failed to follow through on the proceedings. Testimony further established that mother and father had initiated second (or perhaps third) divorce proceedings, which were ongoing during the juvenile-court proceedings below, but that the parents had already missed a hearing in between juvenile-court appearances. While the juvenile court acknowledged that mother and father did have a forthcoming court date in the divorce proceeding, "the record shows that this hearing was likely set for dismissal as the parents may have previously failed to appear after re-filing."

**{¶57}** This evidence was sufficiently clear and convincing for the juvenile court to conclude that "Mother and father continu[e] to be intertwined in each other's lives." And, given their "history of violence," which persisted well into 2023, the court was justified in concluding the risk of domestic violence persisted. That risk had certainly

not been remedied in the first four years of mother's involvement with the Agency, during which mother apparently continued to be in a relationship with father, and during which episodes of abuse continued. And mother's attempted break from father in late 2023 and early 2024 was not nearly so clean, clear, or convincing as to mandate a finding that things had suddenly changed, given the evidence of mother and father's continued interactions, assistance, proximity, and insistence on coparenting.

{¶58} Domestic violence was the reason for removing the children from mother's home, and it remained the principle concern for the juvenile court and the Agency throughout the proceedings. We therefore hold that there was sufficient clear and convincing evidence to sustain the juvenile court's determination that mother had "failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home." *See* R.C. 2151.414(E)(1). Thus, there was sufficient evidence that the children "cannot be placed with [mother] within a reasonable time or should not be placed with [mother]." R.C. 2151.414(B)(1)(a).

b. Manifest Weight

{¶59} Mother argues, however, that the juvenile court (1) did not adequately consider the progress mother had made in her individual therapy, (2) undervalued the positive bonds mother and father had developed with the children, and (3) mistakenly found that "the parents have failed to follow through with their divorce action." By raising these arguments, which, mother suggests, undermine the juvenile court's failure-to-remedy finding, mother effectively suggests that the juvenile court's eligibility finding was against the manifest weight of the evidence.

{¶60} Domestic violence was at the core of the concerns in this case. As we have already concluded, the juvenile court had sufficient evidence to conclude that the risk of domestic violence had not been remedied. Neither the children's positive bonds

17

with their parents, nor mother's individual mental health progress, sufficiently outweighed the evidence of proximity, ongoing relationship, and lack of change motivating the juvenile court's determination that the threat of domestic violence persisted.

**{¶61}** To the extent mother suggests that her progress on the independent goals concerning her mental health and parental bonding "substantially remedied" the Agency's underlying concerns, the juvenile court clearly disagreed. It determined that a failure to remedy the ongoing risk of domestic violence constituted a failure to "substantially remedy" the conditions that drove the Agency to intervene, even despite the progress in other areas. Given that domestic violence was what started these proceedings and had been at their center throughout, we cannot conclude that the juvenile court "lost its way" in so concluding.

**{¶62}** Mother's third contention—i.e., that the juvenile court erroneously held that "the parents have failed to follow through with their divorce action"—*would* tend to undermine (if only slightly) the juvenile court's conclusions regarding the parents' ongoing relationship. However, the juvenile court never made such a finding. Mother's quotation comes from the *magistrate's decision*, not the juvenile court's. And while the juvenile court "approved and adopted" the magistrate's decision, it did so only "as supplemented [by its own opinion] and modified accordingly." In its decision, the juvenile court acknowledged mother's testimony "that the next Court date [in the divorce proceeding with father] was set for May 20, 2024 or May 30, 2024," but noted that "the record shows that this hearing was *likely* set for dismissal as the parents *may have* previously failed to appear after re-filing." Given that the juvenile court did not find that the second divorce proceeding had been abandoned, mother's argument lacks merit.

18

**{¶63}** We therefore hold that the juvenile court's conclusions (1) that domestic violence was the fundamental concern motivating the removal of JWS, JLF1, JDS, JSF, JLF2, and JAF, (2) that there was a continued risk of domestic violence in the home, and (3) that mother had therefore "failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home," were not counter to the manifest weight of the evidence.

## 2. Best-Interests Determination (R.C. 2151.414(D)(1))

**{¶64}** We next consider the sufficiency and weight of the evidence supporting the juvenile court's determination that permanent custody was in the six older children's best interests.

**{¶65}** Even when a child is eligible under R.C. 2151.414(B), a juvenile court may only grant permanent custody to the Agency if it *also* determines that permanent custody would be in the child's best interests. The best-interests test in R.C. 2151.414(D)(1), which is the test at issue in this appeal, directs a juvenile court to determine what is in the best interests of the child by considering a nonexclusive list of statutory factors, including (a) the child's interaction and relationship with family, parents, caregivers, and others, (b) the child's wishes, as expressed by the child or their guardian ad litem, (c) the custodial history of the child, (d) the child's need for a legally secure permanent placement, and (e) whether the parents fall within one of the categories enumerated in R.C. 2151.414(E)(7) through (11). R.C. 2151.414(D)(1).

**{¶66}** With respect to the first factor, R.C. 2151.414(D)(1)(a), the court below found that the "Children share a positive bond with mother and father," noted that the parents regularly participated in visitation, and described how the record was "replete with testimony that the Children are excited to see the parents at visitation and are bonded with them." Indeed, the juvenile court even described how the parents had

implemented positive techniques to better interact with the children with greater behavioral challenges. Nevertheless, the juvenile court determined that "[d]espite this positive bond, the nature of the relationship does not negate the Court's concerns for the Children and family's safety given the extensive history of domestic violence between the parents." The juvenile court also found that the children had positive bonds with each other and that they were doing well in their current foster placements, all of which were open to adoption.

{¶67} With respect to the second factor, R.C. 2151.414(D)(1)(b), the juvenile court acknowledged the GAL's recommendation that the Agency receive permanent custody. The juvenile court also noted that counsel for the three oldest children had informed the court that JWS and JLF1 had expressed a desire to return to mother but had made comments and asked questions that tended to undermine those statements. The court also noted that, according to counsel, "JDS did not clearly indicate that she would like to return to mother or father."

{¶68} With respect to the third factor, R.C. 2151.414(D)(1)(c), the juvenile court found that JWF, JLF1, JDS, and JSF had each been in the care of the Agency for more than three years at the time of the magistrate's decision. It further determined that JLF2 and JAF had been in the Agency's care for their entire lives.

{¶69} With respect to the fourth factor, R.C. 2151.414(D)(1)(d), the juvenile court found that, given statutory constraints, it could not extend the Agency's temporary custody over the six children. Thus, the juvenile court was obligated either to give permanent custody to the Agency or to remand the children to their parents' care. In determining which path was in the children's best interests, the court reiterated the ongoing domestic-violence concerns that had motivated its eligibility determination. Given the "possibility of future harm to the Children if they are

20

returned to the parents' care and the potential that they would be removed from the home again due to the ongoing issues," the juvenile court concluded that "the Children cannot achieve a legally secure placement without a grant of Permanent Custody to the Agency."

{¶70} And, with respect to the fifth and final factor, R.C. 2151.414(B)(1)(e), the juvenile court found that none of the conditions set forth in R.C. 2151.414(E)(7) to (E)(11) applied.

{¶71} Mother's sufficiency and weight challenges concern only the first and fourth factors, R.C. 2151.414(D)(1)(a) and (D)(1)(d).

a. Sufficiency

{¶72} As to sufficiency, the juvenile court's "interrelationship" and "legally secure permanent placement" findings were both rooted in the ongoing risk of domestic violence and the harm it would do to the children. As we have already explained, the record contained sufficient evidence to support the juvenile court's determination that the risk of domestic violence persisted. Further, the magistrate heard ample testimony that the children witnessed this violence, that these experiences had left JWS, JLF1, and JDS with trauma disorders, and that these disorders had led, in some cases, to serious behavioral struggles. These findings not only demonstrated the harm the three oldest children suffered, but also the harm the three younger children, JSF, JLF2, and JAF, would be likely to suffer if they returned to a home in which such domestic violence persisted.

{¶73} The juvenile court therefore had sufficient evidence to support its decision to "prioritize the safety and well-being of the Children" over their positive interactions with parents. Further, the juvenile court had sufficient evidence to fear such incidents would recur, leading to further instability in placement, should the

children be permitted to return to mother.

**{¶74}** The juvenile court's ultimate best-interests conclusion with respect to these six children was also supported by sufficient evidence. The harm caused by mother and father's domestic violence, the risk of that violence persisting, the positive bonds the children had forged in their foster homes, the foster parents' openness to adoption, the young age of all the children when removed, and the need for permanency in placement, were sufficient grounds upon which to sustain the juvenile court's finding that permanent custody was, clearly and convincingly, in the children's best interests.

### b. Manifest Weight

**{¶75}** Mother also suggests that the juvenile court's best-interests finding ran counter to the weight of the evidence. As before, she contends the juvenile court underweighted (1) her positive relationship and progress with the children, (2) her mental-health progress, and (3) the ongoing divorce proceeding.

**{¶76}** Mother's positive bonds go to the first best-interests factor regarding "the interaction and interrelationship of the child with the child's parents." *See* R.C. 2151.414(D)(1)(a). However, as already noted, the juvenile court determined that these positive bonds did "not negate the Court's concerns for the Children and family's safety given the extensive history of domestic violence between the parents." The juvenile court appropriately "prioritize[d] the safety and well-being of the Children," in finding that the ongoing risk of domestic violence outweighed the positive sentiment, however strong and honest. We cannot say that the juvenile court "lost its way" in making that determination.

**{¶77}** Mother's mental-health progress goes primarily to the fourth factor, i.e., whether the children could achieve a secure permanent placement absent a grant of

permanent custody to the Agency. *See* R.C. 2151.414(D)(1)(d). But as discussed with respect to the juvenile court's "failure to remedy" finding under (B)(1)(a) and (E)(1), we do not believe the juvenile court lost its way in finding that mother's mental-health gains were insufficient to alleviate the likelihood of future domestic violence. The juvenile court found that there was a "history of violence" between mother and father that had been "consistent for approximately five years." It further found that, despite any mental-health progress, "Mother and father continu[e] to be intertwined in each other's lives." Given these determinations, which we have already noted were well-founded, and given that mother and father were unable to continue couple's therapy, we hold that mother's individual mental-health progress did not render the juvenile court's best-interests determination against the manifest weight of the evidence.

{¶78} Finally, mother's argument that the juvenile court erred in failing to recognize her ongoing divorce proceedings is unpersuasive here for the same reasons it was unpersuasive under R.C. 2151.414(B)(1)(a) and (E)(1). The juvenile court acknowledged that proceedings were probably ongoing, but nevertheless took notice of the couple's inconsistent and uncompelling attendance to proceedings to that point.

{¶79} For the foregoing reasons, we cannot say that the juvenile court's best-interests determinations were against the manifest weight of the evidence with respect to the oldest six children.

### B. JMF

{¶80} The youngest child in this case, JMF, had not been adjudicated dependent prior to the permanent-custody hearing, and therefore could not be the subject of a motion for permanent custody under R.C. 2151.413. Instead, the Agency sought an initial disposition of permanent custody for JMF under R.C. 2151.353(A)(4), which required the juvenile court to find (1) "that the child cannot be placed with either

parent within a reasonable time or should not be placed with either parent" based on one of the conditions under R.C. 2151.414(E), and (2) that such placement is in the best interests of the child under the all-factors test set forth in R.C. 2151.414(D)(1).

{¶81} The juvenile court found both R.C. 2151.414(E)(1) and 2151.414(D)(1) satisfied with respect to JMF for the same reasons they were satisfied with respect to the six older children. We have already held that those (E)(1) and (D)(1) determinations were based on sufficient evidence and not against the manifest weight of the evidence. We hold the same with respect to JMF.

{¶82} Mother's second assignment of error is therefore overruled.

### III. INEFFECTIVE ASSISTANCE OF CHILDREN'S COUNSEL

{¶83} In her first assignment of error, mother contends that the separate counsel appointed for the three eldest children (JWS, JLF1, and JDS) provided them with ineffective assistance.

{¶84} "[P]ursuant to R.C. 2151.352, as clarified by Juv.R. 4(A) and [current Juv.R. 2(BB)], a child who is the subject of a juvenile court proceeding to terminate parental rights is a party to that proceeding and, therefore, is entitled to independent counsel in certain circumstances." *In re Williams*, 2004-Ohio-1500, ¶ 29. Such a right to counsel "includes the right to effective assistance of counsel." *In re E.S.*, 2011-Ohio-586, ¶ 24 (1st Dist.).

{¶85} While the children have not appealed the juvenile court's judgment, mother has standing to challenge the effectiveness of their counsel. Ohio courts have recognized that "when parents and their child all have the same interest—reunification of the family—the parents have standing to assert on appeal that their child's attorney provided ineffective assistance of counsel when the attorney did not adequately represent that interest for the child." *In re S.S.*, 2012-Ohio-4794, ¶ 26 (10th Dist.);

24

*accord In re Clark*, 141 Ohio App.3d 55, 60 (8th Dist. 2001).

**{¶86}** The standard for determining whether counsel provided effective assistance in a proceeding to terminate parental rights is identical to that applied in the criminal context under *Strickland v. Washington*, 466 U.S. 668 (1984), and *State v. Bradley*, 42 Ohio St.3d 136 (1989). *See In re E.S.* at ¶ 24. Thus, to prove that the children's counsel was ineffective, mother must show (1) that the children's counsel was so deficient as to rebut the presumption of competence and defy classification as "'within the wide range of reasonable professional assistance,'" and (2) that said deficient performance prejudiced the children so that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *See Bradley* at 142, quoting *Strickland* at 689.

**{¶87}** But the posture of this case complicates things. This is an appeal from a juvenile court's order adopting and modifying the decision of a magistrate. "Except for a claim of plain error, a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law . . . , unless the party has objected to that finding or conclusion . . . ." Juv.R. 40(D)(3)(b)(iv).

**{¶88}** Mother challenges the ultimate conclusion of the magistrate, as adopted by the juvenile court, because she contends it was based on a proceeding in which the children's counsel was prejudicially ineffective. But mother did not raise this issue in the objections she filed with the juvenile court. Our review is therefore limited to plain error. *See In re J.J.*, 2006-Ohio-6151, ¶ 23 and 27 (10th Dist.) (applying plain-error review to ineffective-assistance claim because appellant did not object to magistrate's decision on that ground); *see also In re J.W.*, 2019-Ohio-2730, ¶ 7 (1st Dist.) (applying plain-error review to interlocutory denial of continuance by magistrate because

mother did not object to magistrate's ruling below). Reversal of a civil judgment based on plain error "'is not favored and may be applied only in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself.'" *In re F.B.*, 2020-Ohio-5610, ¶ 12 (1st Dist.), quoting *State v. Morgan*, 2017-Ohio-7565, ¶ 39.

**{¶89}** As noted above, the magistrate appointed conflict-counsel for the three oldest children, whom it believed might have interests conflicting with the GAL's position. Mother posits four grounds for finding conflict-counsel ineffective.

**{¶90}** *First*, mother points to several instances in the record when conflict-counsel misidentified which children she represented. Even assuming this constituted ineffective assistance, mother has failed to show prejudice. Even if, based on misstatements by conflict-counsel, the magistrate had misunderstood which children the conflict-counsel represented, both the magistrate and juvenile court concluded that awarding permanent custody to the Agency was in the best interest of *all seven* children. Mother has not shown that, but for counsel's misidentifications, the magistrate or juvenile court would have reached another disposition for one or more of the children.

**{¶91}** *Second*, mother contends that conflict-counsel failed to advocate appropriately for the children to be returned to her care, which, mother contends, was the whole point of appointing conflict-counsel. But conflict-counsel expressed that, while the children "will verbalize that they wish to be with their mother," their actions and questions made it unclear whether they really wished to return. As a reminder, JWS was 8 years old at this time, JLF1 had just turned 7, and JDS was 5. In closing

arguments, conflict-counsel frankly expressed her confusion as to the children's actual wishes and acknowledged that her tentative position "doesn't make a lot of sense."

**{¶92}** Again, even if we assume that this constituted ineffective assistance, we nevertheless hold that mother has failed to show prejudice so obvious as to constitute plain error. The juvenile court unambiguously acknowledged the children's strong bonds with both mother and father in spite of their trauma. It noted how the record was "replete with testimony that the Children are excited to see the parents at visitation and are bonded with them." It described the positive steps taken to learn behavior-management techniques to help JLF1. And it acknowledged the consistent, positive visitation experiences mother and father had with the children. Even in spite of the children's affinity for mother and father, the juvenile court felt the risks posed by continued parental custody were too great for such a disposition to be in the children's best interests. It is far from "plain" that the juvenile court's balancing would or should have been different, had the three oldest children unambiguously requested parental custody.

**{¶93}** *Third*, mother points to instances in which she alleges the children's conflict-counsel elicited testimony damaging to mother and, therefore, to the children's desire for reunification. But "[a]n appellate court reviewing an ineffective assistance of counsel claim must not scrutinize trial counsel's strategic decision to engage, or not engage, in a particular line of questioning on cross-examination," as "[s]uch decisions are presumed to be the product of a sound trial strategy." *State v. Revels*, 2002-Ohio-4231, ¶ 28 (12th Dist.), cited in *In re J.J.*, 2006-Ohio-6151, at ¶ 35 (10th Dist.). Thus, even if we imposed upon conflict-counsel an unmitigated duty to advocate for the children's return to mother, we could not say that the juvenile court had plainly and obviously erred by failing to sua sponte scrutinize conflict-counsel's

lines of cross-examination.

**{¶94}** *Fourth*, and finally, mother intimates that conflict-counsel was ineffective for failing to file objections to the magistrate's decision. But the decision to accept, rather than object to, a magistrate's decision is not *itself* ineffective assistance—otherwise, every lawyer who advised their client against seeking review of an adverse decision could presumably be deemed ineffective. Mother provides no more specific theory explaining how this constituted ineffective assistance, other than to say that the children had not been aligned with a permanent-custody disposition at the start of the hearing. Mother also fails to identify any prejudice resulting from this failure. In fact, mother could, and presumably did, raise any objections she might have wished conflict-counsel to raise in her own objections filed below.

**{¶95}** For these reasons, mother's first assignment of error is overruled.

### IV. CONCLUSION

**{¶96}** Having overruled both of mother's assignments of error and finding no assignments of error to address in father's brief, we affirm the judgment of the juvenile court.

Judgment affirmed.

**ZAYAS, P.J.,** and **BOCK, J.,** concur.

Please note:

The court has recorded its entry on the date of the release of this opinion.