[Cite as *In re J. Children*, 2025-Ohio-1430.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | | |
|---|---|---|---|
| IN RE: J. CHILDREN | : | APPEAL NOS. | C-250027 |
| | | | C-250053 |
| | : | TRIAL NO. | F/21/1204 X |
| | : | | |
| | : | *O P I N I O N* | |

Appeal From: Hamilton County Juvenile Court

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: April 23, 2025

*Jeffrey J. Cutcher*, for Appellant Mother,

*Cynthia S. Daugherty*, for Appellant Father,

*Connie Pillich*, Hamilton County Prosecuting Attorney, and *Patsy Bradbury*, Assistant Prosecuting Attorney, for Appellee Hamilton County Department of Job and Family Services,

*Kacy C. Eaves*, Appellee Guardian ad Litem for the minor children.

**KINSLEY, Presiding Judge.**

**{¶1}** In these consolidated appeals, mother and father appeal the judgment of the Hamilton County Juvenile Court granting permanent custody of their three children, D.J., L.J., and S.J., to the Hamilton County Department of Job and Family Services ("HCJFS"). Mother and father argue that the juvenile court's judgment terminating their parental rights and awarding permanent custody of their children to HCJFS was not supported by sufficient evidence and was against the manifest weight of the evidence. For the reasons set forth below, we overrule parents' assignments of error and affirm the juvenile court's judgment.

### *Factual and Procedural History*

**{¶2}** Mother and father first encountered HCJFS in October 2021 when police responded to a domestic dispute at a motel where mother and father were staying with their three children, D.J., then age six, L.J., then age three, and S.J., then age one (referred to collectively as "the J. children"). Police arrested mother for domestic violence. According to HCJFS, father owned a truck-cleaning business, and the family traveled around the country for his job and had only been in Hamilton County for two days at the time of HCJFS's involvement. The family also had a history with children's services agencies in two other Ohio counties and the State of Maryland.

**{¶3}** Based on these events, HCJFS sought interim temporary custody of the J. children. Later, in December 2021, HCJFS moved for temporary custody of the children on the basis that they were dependent under R.C. 2151.04(C).

**{¶4}** A guardian ad litem ("GAL") was appointed to investigate the children's best interest. In that regard, the GAL filed a report indicating that father had been convicted of child endangerment and child trafficking in Indiana in 1999 with respect to two of his children, who are not part of the underlying case. In those cases, father

reportedly locked the children in a home that caught fire and also committed physical, sexual, and emotional abuse. Father's children were never reunified with him. According to the GAL's report, father was also convicted of offenses involving neglect and child trafficking in Marion County, Ohio, in 1997 and impersonating a public official in Brown County, Ohio, in 1999. With respect to mother and father, the GAL's report indicated that in 2016 and 2017, children's services agencies in Indiana had substantiated two allegations of child abuse and also reported substance abuse by mother, but the agency could not implement a safety plan because the family could not be located.

**{¶5}** The juvenile court adjudicated the J. children dependent in December 2021 and committed them to the temporary custody of HCJFS in January 2022. HCJFS implemented a case plan that sought reunification. Both mother and father completed a diagnostic assessment of functioning, and HCJFS recommended that parents undergo parenting education, domestic-violence services, and random toxicology screens. HCJFS also required that parents maintain consistent visitation with the children and obtain stable housing and income. In August 2022, HCJFS moved to extend temporary custody, which the juvenile court granted.

**{¶6}** In February 2023, HCJFS moved to modify temporary custody to permanent custody. According to the motion, both parents lacked stable housing and had been living either in Alabama or Georgia over the preceding months, essentially abandoning their children in Ohio. Father tested positive for illegal substances, including cocaine and methamphetamines, and had failed to complete the case-plan services for mental health, domestic violence, and parenting. Mother also failed to complete all recommended case-plan services. The GAL filed a report and recommended a commitment of permanent custody. According to the GAL, the

3

parents had not made any meaningful progress with their case-plan services and had not engaged in consistent visitation with their children.

{¶7} The juvenile court interviewed the children individually in chambers for purposes of the permanent-custody motion. D.J., the oldest sibling, communicated that he would like to reunify with his parents if it were safe to do so. The juvenile court accordingly appointed separate counsel for D.J. for the permanent-custody trial, because his desire to reunify with parents was at odds with the recommendation of the GAL. L.J. wished to remain in his foster home, and S.J. was too young to communicate her wishes.

{¶8} The matter proceeded to a trial before the magistrate.

### A. The Permanent-Custody Trial

{¶9} At trial, HCJFS presented testimony from an employee of Women Helping Women ("WHW"), a domestic-violence agency. The WHW employee testified that mother had disclosed repeated incidents of domestic violence by father. Mother had accordingly enrolled in a domestic-violence class in late 2021 and early 2022. Consistent with the patterns of domestic abuse, mother struggled to terminate her relationship with father despite successfully completing the course. According to the WHW employee, mother also contacted WHW on more than one occasion after completion of the course seeking help related to her safety and well-being.

{¶10} HCJFS also presented testimony from the former caseworker, who had responsibility for the J. children's case from its inception until June or July 2022. The former caseworker testified that mother had disclosed abuse by father and that the caseworker observed a bruise on mother. HCFJS referred mother to domestic-violence services and referred father to anger management, but did not notify law enforcement of father's actions. After mother completed a domestic-violence

4

program, the caseworker referred mother to domestic-violence services a second time, at mother's request, but those services ceased when mother did not participate. In May 2022, mother told the caseworker that she would not leave father.

**{¶11}** The former caseworker testified that father had tested positive for methamphetamine, which father attributed to a cold medicine. As to visitation with the children, the caseworker ensured that mother and father had separate, supervised visits with the children; however, because parents moved from state to state depending on father's truck-cleaning jobs, they did not consistently attend visits. Mother and father also lacked stable housing and continued to live from hotel to hotel, depending on father's work.

**{¶12}** The ongoing HCJFS caseworker also testified. The caseworker testified that she had assumed case responsibility for the J. children in June 2022. In terms of the father's case-plan progress, father had been referred to an anger-management program and had participated on some level, but not consistently. Father also partially completed parenting education. At one point, father tested positive for cocaine. Father told the caseworker that "crackheads" lived in the hotel where they were staying and that "cocaine was going through the ventilation system."

**{¶13}** The caseworker testified that parents had moved throughout the past two years to several different states, resulting in inconsistent visitation with their children, and that parents had not progressed beyond supervised visitation. With regard to domestic violence, the caseworker testified that mother had disclosed that father had been abusive on several different occasions. The caseworker personally called an emergency hotline on behalf of mother three separate times. The most recent report of abuse from mother occurred in the fall of 2023, and the caseworker along with another agency were able to help mother escape; however, mother was back with

father five or six days later.

**{¶14}** The caseworker testified that in addition to the ongoing domestic violence, HCJFS could not rule out substance-abuse issues for mother and father. Mother reported that she continued to use marijuana, and mother could not participate in all of her random toxicology screens because she lacked proper identification. HCJFS also had ongoing concerns regarding housing. In addition to parents' traveling state-to-state and living in motels, mother reported that, at times, she and father slept in their truck. With regard to the J. children's placement, the caseworker testified that all children were bonded to their foster families.

**{¶15}** S.J.'s foster mother also testified at the permanent-custody trial. S.J.'s foster mother echoed the caseworker's testimony that S.J. had bonded with her foster family. The foster mother also testified that S.J. has sleep and anxiety issues and that S.J. has difficulty regulating her behavior, particularly in the days following visits with her mother and father. As a result, S.J. receives medical treatment for her anxiety and sleep issues and takes medication. S.J.'s foster mother testified that mother had reached out to her in the spring of 2023 disclosing physical and emotional abuse by father. The foster mother reported the conversation she had with mother to social workers in an attempt to help mother leave father. The foster mother testified that she had periodic communications with mother and father, but that those communications have stopped since parents accused foster mother of sexually abusing S.J. S.J.'s foster mother indicated a willingness to adopt S.J.

**{¶16}** The foster mother of D.J. and L.J. also testified. D.J. and L.J. began living with their foster family in December 2021, and at that time, neither child had ever been enrolled in an educational program or received medical care. The foster mother testified that both boys were in school, receiving medical care, and thriving

6

overall. The foster mother testified that in the fall of 2023, mother disclosed to her that domestic violence by father was still occurring. Mother also disclosed that father would sell her in exchange for sex with other men when they were out of money. The foster mother also testified that mother and father had reached out on several occasions asking for money, and most recently mother had reached out asking for money approximately one month prior to trial. The foster mother indicated a willingness to adopt D.J. and L.J.

{¶17} Mother and father testified remotely in the presence of one another from their vehicle. Mother and father requested that the children return to their custody. Mother testified that she and father had remained married and living together in various hotels while moving for father's job. Mother denied that any domestic disputes had occurred recently, and mother testified that father had been gentler and more communicative since having heart issues that required hospitalization. Mother also stated that she had been sober from alcohol for seven months and that she learned in her domestic-violence program to use coping skills. During father's testimony, he reiterated that his heart issues had caused him to reexamine his life. However, father never acknowledged the evidence suggesting that he had engaged in a long-standing pattern of domestic violence against mother.

### B. The Magistrate's Decision

{¶18} At the conclusion of trial in August 2024, the magistrate entered a decision granting permanent custody of the J. children to HCJFS. Pursuant to R.C. 2151.414(B)(1), the magistrate found that the children had been in the temporary custody of HCJFS for more than 12 consecutive months at the time of the permanent-custody filing, and that the children could not be placed with parents within a reasonable time or should not be placed with either parent.

**{¶19}** The magistrate also found that permanent custody was in the best interest of the children under R.C. 2151.414(D)(1). In that regard, the magistrate concluded that parents had not remedied the substance abuse and domestic violence that had led to HCJFS involvement in the first place. Parents remained without stable housing or income, and parents had never progressed beyond supervised visitation with children. The children had never received educational programming or medical care while in parents' care, and parents had not attended any of the medical appointments for the children while they were in foster care. The magistrate also found that the children were bonded to their foster families, and that the two foster families had worked together to keep the sibling relationship intact.

### C. Objections and Juvenile Court's Decision

**{¶20}** Mother and father filed objections to the magistrate's decision entered in favor of HCJFS. HCJFS and the GAL urged the juvenile court to adopt the magistrate's decision awarding permanent custody of the J. children to HCJFS.

**{¶21}** The juvenile court conducted an independent review of the permanent-custody matter, overruled parents' objections, and adopted the decision of the magistrate with the added clarification that the J. children had entered the temporary custody of HCJFS at the earliest on December 7, 2021, and not October 8, 2021, when the agency received emergency, interim custody.

**{¶22}** Mother and father have appealed.

### Analysis

**{¶23}** We consider mother's and father's assignments of error together. Father asserts in a single assignment of error that the juvenile court erred as a matter of law in granting permanent custody of the J. children to HCJFS. Mother asserts in two separate assignments of error that the juvenile court erred in finding that the best

interest of the children would be served by granting permanent custody to HCJFS, and erred in finding that the children could not be placed with mother in a reasonable time or should not be placed with mother.

**{¶24}** R.C. 2151.414 governs the termination of parental rights. An appellate court reviews a juvenile court's decision to terminate parental rights and award permanent custody of a child to a children's services agency under R.C. 2151.414 on sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence grounds. *In re Z.C.*, 2023-Ohio-4703, ¶ 18. In reviewing a permanent-custody decision on sufficiency-of-the-evidence grounds, an appellate court reviews the juvenile court's decision to determine whether it is supported the requisite degree of proof, here clear and convincing evidence. *Id.* By contrast, in reviewing a juvenile court's decision to grant permanent custody on weight-of-the-evidence grounds, "the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *Id.* at ¶ 14, citing *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 10.

**{¶25}** When ruling on a motion for permanent custody filed by a children's services agency, a juvenile court applies a two-prong test under R.C. 2151.414(B)(1): first, the court must find clear and convincing evidence supporting one of the eligibility factors under R.C. 2151.414(B)(1)(a)-(e); second, the court must find by clear and convincing evidence that permanent custody is in the best interest of the children under either R.C. 2151.414(D)(1) or 2151.414(D)(2). *In re C.W.*, 2024-Ohio-4987, ¶ 45 (1st Dist.).

**{¶26}** With respect to the R.C. 2151.414(B)(1) factors, the juvenile court

9

determined that the J. children had been in the temporary custody of HCJFS for 12 or more months of a consecutive 22-month period. *See* R.C. 2151.414(B)(1)(d). Neither mother nor father dispute the juvenile court's determination with regard to this factor—the children entered temporary custody in December 2021, and HCJFS moved for permanent custody in February 2023. Mother argues that the juvenile court erred in determining that the children could not be placed with her within a reasonable time or should not be placed with her under R.C. 2151.414(B)(1)(a); however, because the juvenile court's finding under R.C. 2151.414(B)(1)(d) is supported by clear and convincing evidence, we need not review the alternate finding by the juvenile court under R.C. 2151.414(B)(1)(a). *See In re S/F Children*, 2025-Ohio-822, ¶ 44 (1st Dist.).

{¶27} With respect to the best-interest factors under R.C. 2151.414(D), the magistrate applied both R.C. 2151.414(D)(1) and (D)(2); however, in conducting its independent review, the juvenile court recognized that R.C. 2151.414(D)(2) did not apply because the children had not been in the temporary custody of HCJFS for two years at the time of the filing of the permanent-custody motion. Therefore, it only applied the best-interest factors under R.C. 2151.414(D)(1).

{¶28} In making a best-interest determination under R.C. 2151.414(D)(1), a juvenile court must consider the following factors: (a) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child; (b) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (c) the custodial history of the child; (d) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (e) whether any of the factors in R.C.

2151.414(E)(7)-(11) apply.

{¶29} As to the best-interest factors under R.C. 2151.414(D)(1), the juvenile court determined that the best interest of the J. children would be served by an award of permanent custody. The juvenile court recognized that the J. children were bonded to one another and parents; however, the children were also bonded to their foster families, who were willing to adopt the children. The juvenile court determined that S.J. was too young to express her wishes, and that L.J. wanted to remain in his foster home. D.J. indicated that he wanted to return to his parents, but only if it were safe to do so. The juvenile court determined that the children had been in the custody of HCJFS for 1,053 days at the time of the magistrate's decision, and that a legally-secure placement could not be achieved without a grant of permanent custody. The parents had never progressed past supervised visitation with the children, and no motions for legal custody had been filed.

{¶30} On appeal, mother argues that she and father have positive interactions with the J. children during visits, and that the children have a bond with them. With regard to substance abuse, mother argues that HCJFS has not referred her for a toxicology screen since 2023, and that she had been sober from alcohol for seven months at the time of trial. Mother also argues that she and father have been better at resolving conflicts and using coping skills, so that domestic violence is not an issue.

{¶31} Father argues that the J. children remain bonded with both parents, and that D.J. and L.J. will grow up living in a different household than S.J. Father argues that even though L.J. has indicated that he wants to live with his foster family, no child could possibly grasp the finality of permanent custody. Father argues that the testimony presented by HCJFS with regard to domestic violence and substance abuse is outdated, and that mother and father had both transformed their behaviors in the

11

months preceding trial.

**{¶32}** We conclude that the juvenile court's determination as to the best-interest factors was supported by sufficient evidence and was not against the manifest weight of the evidence. The juvenile court found that mother and father had not been consistent in their progress with case-plan services, nor did parents demonstrate an ability to provide a legally-secure permanent placement that would enable the children to safely return to their care, particularly with regard to substance abuse, domestic violence, stable income, and housing. The record supports these conclusions.

**{¶33}** With regard to income and housing, the record reflects that mother does not work and has no source of independent income. Mother travels around the country with father, who is reportedly self-employed polishing semi-trucks. Parents lack stable housing, and continue to live in hotels, or in their truck. Mother and father both approached D.J. and L.J.'s foster parents for money on multiple occasions, including as recently as one month prior to trial. The record also reflects that the two oldest children had not been given an education or medical care at all prior to entering the custody of HCJFS. Thus, the evidence presented at trial supports the juvenile court's conclusion that parents cannot provide basic necessities for their children.

**{¶34}** That inability is the most significant impediment to parents retaining custody of their children. But the record also supports the juvenile court's conclusions with regard to the lack of safety and stability. The evidence reflects, at the very least, a strong suggestion that father has abused mother for a long period of time, that father has a record of convictions indicating a propensity for human trafficking and child endangerment, and that father lacks an awareness of or desire to change his conduct. With regard to substance abuse, the juvenile court credited mother's testimony that she was currently sober from alcohol. But mother also admitted to using marijuana to

cope with trauma she has endured. Father had two positive toxicology screens—one for methamphetamine and one for cocaine. Each time he denied using illegal substances and blamed the positive results on a cold medicine he had taken and the ventilation system at the hotel, explanations the court below found not to be credible. We agree with the juvenile court's assessment of the evidence regarding the children's best interest in light of this testimony.

**{¶35}** In sum, the juvenile court's decision granting HCJFS permanent custody of D.J., L.J., and S.J. is supported by sufficient evidence and is not against the manifest weight of the evidence. As a result, we overrule mother's two assignments of error and overrule father's assignment of error.

### *Conclusion*

**{¶36}** We affirm the juvenile court's judgment awarding permanent custody of the J. children to HCJFS under R.C. 2151.414(B)(1) and (D)(1), as the children were in the temporary custody of HCJFS for 12 or more months of a consecutive 22-month period and an award of permanent custody was in their best interest.

Judgment affirmed.

**ZAYAS** and **MOORE, JJ.,** concur.

Please note:

The court has recorded its entry on the date of the release of this opinion.