[Cite as *In re M. Children*, 2025-Ohio-4744.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

IN RE: M. CHILDREN          :       APPEAL NO.    C-250379
                                         TRIAL NO.     F/20/1196 Z

                                 :

                                 :           *JUDGMENT ENTRY*

This cause was heard upon the appeal, the record, and the briefs.

For the reasons set forth in the Opinion filed this date, the judgment of the trial court is affirmed.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs be taxed under App.R. 24.

The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate be sent to the trial court for execution under App.R. 27.

**To the clerk:**

**Enter upon the journal of the court on 10/15/2025 per order of the court.**

**By:**_____
        **Administrative Judge**

[Cite as *In re M. Children*, 2025-Ohio-4744.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


IN RE: M. CHILDREN          :        APPEAL NO.    C-250379
                                         TRIAL NO.      F/20/1196 Z

                                 :

                                 :          *O P I N I O N*


Appeal From: Hamilton County Juvenile Court

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: October 15, 2025


*James J. Whitfield,* for Appellant Mother,

*Connie Pillich,* Hamilton County Prosecuting Attorney, and *Patsy Bradbury,* Assistant Prosecuting Attorney, for Appellee Hamilton County Department of Job and Family Services,

*Raymond T. Faller,* Hamilton County Public Defender, and *Kimberly A. Helfrich,* Assistant Public Defender, for Appellee Guardian Ad Litem.

**Bock, Judge.**

{¶1} Appellant Mother appeals the juvenile court's grant of permanent custody of her three children, Ma.M., Mi.M., and J.M. ("M. Children"), to the Hamilton County Department of Job and Family Services ("HCJFS"). Mother raises two assignments of error.

{¶2} We overrule Mother's first assignment of error and hold that the juvenile court was not required to determine whether HCJFS made reasonable efforts to reunify the family when deciding HCJFS's R.C. 2151.413 permanent-custody motion because the trial court had made a reasonable-efforts finding earlier in the proceedings.

{¶3} We overrule Mother's second assignment of error and hold that the juvenile court's judgment granting HCJFS permanent custody of the children based on Mother's inability to provide the children with a legally-secure permanent placement was not contrary to the weight of the evidence. That evidence revealed that Mother tested positive for methamphetamine months before the hearing, did not distance herself from the M. Children's father ("Father"), and minimized domestic-violence issues in their relationship.

{¶4} We affirm the juvenile court's judgment.

### I. Factual and Procedural History

{¶5} Mother and her ex-husband, J.A. ("Ex-Husband") have five children together—P.A., A.A., Sa.A., C.A., and Se.A. (collectively, the "A. Children"). Mother and Ex-Husband coparent under a shared-parenting plan, wherein Mother is the A. Children's residential parent. After her divorce from Ex-Husband, Mother married Father and welcomed twins, Ma.M. and Mi.M., in January 2019. Then in 2021, Mother and Father welcomed J.M.

## A. HCJFS's custody motions

{¶6}   In December 2020, HCJFS filed a complaint and motion for temporary custody or protective supervision of Ma.M. and Mi.M. HCJFS alleged that Ma.M. and Mi.M. were dependent based on Mother's hospital admission for a mental-health emergency while Father was on parole and living in a Talbert-House facility.

{¶7}   After a hearing, the magistrate denied HCJFS's request for temporary custody but granted HCJFS protective supervision over Ma.M. and Mi.M. The trial court instructed Mother to (1) follow treatment recommendations, (2) submit to a diagnostic assessment and follow any recommendations, (3) comply with the recommended medication regime, (4) prohibit Father from having unsupervised contact with the children, (5) not be the person to supervise Father with the children, (6) not allow Father to live in the home with the children, (7) sign all release-of-information forms requested by HCJFS, and (8) use protective daycare as required.

{¶8}   The magistrate appointed a guardian ad litem ("GAL") for Ma.M. and Mi.M. HCJFS's case plan named Father's drug use and Mother's untreated mental-health issues as areas of concern. In February 2021, the magistrate adjudicated Ma.M. and Mi.M. dependent and extended the protective-supervision order.

{¶9}   In June 2021, HCJFS filed a second complaint and motion for temporary custody of Ma.M. and Mi.M. based on allegations of neglect and dependency. It alleged that Father's parole officers found Mother in the house during Father's parenting time, which violated the terms of his parole, and that Father, who had been carrying Mi.M. when officers entered the house, tossed his son to an officer—causing the child to hit the corner of the kitchen counter—and fled the scene. The magistrate granted HCJFS interim custody of Ma.M. and Mi.M. In August 2021, the court adjudicated Ma.M. and Mi.M. dependent for a second time.

{¶10} J.M. was born to Mother and Father in August 2021. Days later, HCJFS sought temporary custody of J.M. In September 2021, the magistrate adjudicated J.M. dependent based on Father's actions during his parole violation. The magistrate supplemented his order with a finding that HCJFS made reasonable efforts to prevent J.M.'s removal through substitute care, visitation, mental-health treatment, protective daycare, and case management. Mother objected to J.M.'s dependency adjudication on manifest-weight grounds, but the juvenile court overruled her objection.

{¶11} The magistrate extended HCJFS's temporary custody of the M. Children, noting that HCJFS expected Mother to "satisfactorily engage in case plan services and demonstrate the necessary behavior change[] before she is reunified with her children." He found that Mother was engaged in "behavioral counseling," consistently visited the M. Children, and had attended some of their therapeutic appointments. But HCJFS believed that Mother's "counseling was not addressing the pattern of behavior between her and [F]ather" and Mother was not consistently attending the M. Children's appointments. The magistrate found that HCJFS had made reasonable efforts to end the continued removal of the M. Children through "substitute care, visitation, counseling, therapeutic services, and caseplan management."

{¶12} Then in November 2022, HCJFS moved for permanent custody of the M. Children under R.C. 2151.413(A) and "a finding that HCJFS made reasonable efforts to eliminate the continued need for the children's removal from their home and that the children's best interests dictates [sic] continued out of home placement." HCJFS alleged in the motion that Mother continued to struggle with mental-health issues, failed "to attend the children's medical and therapy appointments," reduced

her visitation schedule, and did not "learn appropriate interventions and strategies to use when interacting with her children."

{¶13} Ex-Husband moved for custody of the M. Children to allow the M. Children to "live with[] and grow up with their siblings and near other family." The next month, HCJFS filed a complaint and a motion for temporary custody of the A. Children, alleging that some of the A. Children were living with Mother. Relevant here, the magistrate entered protective supervision orders over some of the A. Children and required Mother to undergo random drug screens. Ex-Husband withdrew his petition for custody of the M. Children.

## B. **Permanent-custody hearing**

{¶14} The magistrate held permanent-custody hearings in May, July, and August 2024. HCJFS's case for terminating Mother's parental rights rested on Mother's case-plan progress, mental-health issues and treatment, substance-abuse issues and treatment, visits with the M. Children, and relationship with Father.

{¶15} At the time of the hearings, Mother and Father had been married for six years. In January 2024, Mother had moved into a house owned by her father, where some of the A. Children lived. Mother had a full-time, remote job. Father was in prison during the hearings and most of the time that this case was pending below.

{¶16} The twins were around five years old at the time of the permanent-custody hearings, were set to start kindergarten in August 2024, and had lived with their foster parents for more than two years. Their foster mother testified that the twins were two years old when they were placed with her and were "basically . . . like infants who just laid on their back and cried, had some food insecurities . . . had really low muscle tone, weren't talking." Both twins were diagnosed with global development delay, and Ma.M. was diagnosed with autism spectrum disorder. The twins have

6

received physical, occupational, speech, and feeding therapy while in foster care. At the time of the hearings, Ma.M. had four appointments and Mi.M. had three appointments each week.

{¶17} J.M. was placed into foster care days after he was born in August 2021 and was almost three years old when the hearings began. J.M.'s foster mother testified that J.M.'s shoulder was injured during birth and he was "slow to use his limbs." J.M. was diagnosed with hypotonia, global development delay, sensory processing disorder, and autism spectrum disorder. J.M. has weekly occupational, feeding, and sensory-therapy appointments, and will need "ABA therapy."

1. Mother's progress with case-plan services

{¶18} Mother completed two diagnostic assessments of functioning ("DAFs") in 2020 and 2023. Her first DAF assessor recommended that HCJFS offer Mother "parental programs that would include information on how to help kids with developmental disabilities." Mother testified that HCJFS did not offer that service. In 2023, her DAF assessor recommended that HCJFS provide Mother with outpatient substance-abuse treatment, random drug screens, individual counseling, and pharmacological management. And her assessor suggested that HCJFS offer Mother parenting support and education for parents of children with developmental delays and Nar-Anon as beneficial services.

{¶19} Mother testified that HCJFS ignored those suggestions. As part of Mother's case plan, HCJFS coordinated her mental-health treatment and visitation with the children through Family Nurturing Center ("FNC"). Later, HCJFS provided drug screens. Eventually, a Caseworker[1] referred Mother for a parenting evaluation.

---

[1] Numerous HCJFS employees worked on the family's case, supervised caseworkers, and testified at the hearings. We refer to HCJFS employees overseeing the family's case as "Caseworker(s)."

**{¶20}** Mother routinely met with her Caseworkers. She recalled repeatedly asking them "what they wanted to see" from her to allow her to regain custody of her children. According to Mother, HCJFS and the Caseworkers did not set concrete goals, so Mother attended a host of parenting and trauma classes at Beech Acres. Mother testified that she implements the lessons she learned from those classes and what she has learned from her children's therapy appointments.

### i. *Visitation and the children's appointments*

**{¶21}** Initially, Mother resisted suggestions about the M. Children's needs and doubted the need for their appointments to address their special needs. At first, she arrived at the end of her children's appointments. In 2022, HCJFS told Mother they wanted her to attend more consistently. Eventually, Mother was engaged with the children's therapy appointments and HCJFS was satisfied with her attendance. Sometimes, Mother's work schedule conflicted with the children's appointments. Mother testified that, if the juvenile court returned the children to her custody, she would schedule the children's appointment to a facility closer to her home. And with the help of her support network, she expected no issues with her children's appointments.

**{¶22}** Mother's visits with the children first occurred at Family Nurturing Center ("FNC"), with supervision. In 2022, visits transitioned to Mother's home. Caseworkers were initially concerned about cleanliness in Mother's house, but she was receptive to feedback. A Caseworker described Mother as attentive and receptive to her children.

**{¶23}** An FNC employee supervised Mother's visits with the M. Children from November 2022 to March 2024. She testified that Mother was receptive to feedback and had no concerns with Mother's parenting. The FNC employee also testified that

the children's transition from Mother to their foster parents after visits were "long and drawn out" because the foster parents lingered in Mother's home "looking around the house" and "trying to find things wrong that were not necessarily a problem, which would lead to "complaints about the house" and "other things that were going on."

## ii. *Mother's mental health*

{¶24} Mother had anxiety and received mental-health treatment before this case began. Mother testified that, during the COVID-19 pandemic, she began having panic attacks because she was "isolated and living alone with the twins." She called police, arranged childcare, and went to the hospital for psychiatric treatment, which led to the "twins [being] removed into foster care on that day." Sa.A., Mother's teenage son, testified that Mother was "very distressed" in 2021 and not "in a great state of mind" after HCJFS removed Ma.M. and Mi.M.

{¶25} As part of her case plan, Mother began therapy in 2020. Caseworkers testified that Mother consistently attended her mental-health treatment. Mother and her Caseworkers testified that Father's substance abuse and his behaviors were a trigger for Mother. Mother worked on her own substance-abuse issues and her boundaries with Father in therapy. According to Sa.A., Mother is currently "more composed," "more empathetic," and is selfless.

{¶26} In August 2022, Mother admitted herself to Becket Springs, an inpatient mental-health-treatment facility in Cincinnati, Ohio. After her inpatient stay, she engaged in outpatient treatment. The Beckett Springs admission packet reveals that Mother reported having suicidal thoughts. But she was deemed "stable" when she was discharged ten days later. At the hearing, Mother adamantly denied being suicidal or reporting thoughts of suicide to Beckett Springs.

{¶27} Caseworkers testified that Mother did not apply what she learned in therapy. HCJFS wanted to see that Mother could "parent as well as addressing . . . the mental health, being able to self-protect, protect herself, protect her children, being able to identify . . . triggers and . . . appropriate responses to those." Another Caseworker testified that Mother's therapist reported that Mother was making progress. While Mother followed HCJFS's therapy requirements, a Caseworker testified that the mental-health component of Mother's case plan was incomplete because the agency had not seen changes in Mother's behavior or in her involvement with Father.

### iii. *Mother's substance-use issues*

{¶28} Mother testified that she had used marijuana, and occasionally cocaine, in the past. In 2019, she tried methamphetamine. According to Mother, she used methamphetamine semi-regularly by the spring of 2022. By summer, she was using methamphetamine every day to "deal with the trauma" caused by HCJFS's removing her children and the death of a family member. Her daily methamphetamine use continued for three months, until her "life became unmanageable" and she sought treatment at Beckett Springs.

{¶29} Mother checked herself into Beckett Springs and participated in inpatient substance-abuse treatment. During her ten-day stay, Mother realized that she was a "drug addict" and "at risk of drug use anytime [she's] around someone who's using." After her stay, Mother began outpatient treatment, which was three-hour-long sessions, three days each week. But she discontinued that intensive outpatient-treatment program when its demands threatened her employment. At the time of trial, Mother participated in "Sober Recovery," a support group with weekly meetings.