[Cite as *In re M. Children*, 2025-Ohio-4744.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

IN RE: M. CHILDREN

:        APPEAL NO.    C-250379
         TRIAL NO.     F/20/1196 Z

:

:        *JUDGMENT ENTRY*


This cause was heard upon the appeal, the record, and the briefs.

For the reasons set forth in the Opinion filed this date, the judgment of the trial court is affirmed.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs be taxed under App.R. 24.

The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate be sent to the trial court for execution under App.R. 27.


**To the clerk:**

**Enter upon the journal of the court on 10/15/2025 per order of the court.**


**By:**_____
      **Administrative Judge**

**[Cite as *In re M. Children*, 2025-Ohio-4744.]**

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


IN RE: M. CHILDREN   :   APPEAL NO.   C-250379
                         TRIAL NO.    F/20/1196 Z

                     :

                     :        *O P I N I O N*


Appeal From: Hamilton County Juvenile Court

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: October 15, 2025


*James J. Whitfield,* for Appellant Mother,

*Connie Pillich,* Hamilton County Prosecuting Attorney, and *Patsy Bradbury,* Assistant Prosecuting Attorney, for Appellee Hamilton County Department of Job and Family Services,

*Raymond T. Faller,* Hamilton County Public Defender, and *Kimberly A. Helfrich,* Assistant Public Defender, for Appellee Guardian Ad Litem.

**Bock, Judge.**

**{¶1}** Appellant Mother appeals the juvenile court's grant of permanent custody of her three children, Ma.M., Mi.M., and J.M. ("M. Children"), to the Hamilton County Department of Job and Family Services ("HCJFS"). Mother raises two assignments of error.

**{¶2}** We overrule Mother's first assignment of error and hold that the juvenile court was not required to determine whether HCJFS made reasonable efforts to reunify the family when deciding HCJFS's R.C. 2151.413 permanent-custody motion because the trial court had made a reasonable-efforts finding earlier in the proceedings.

**{¶3}** We overrule Mother's second assignment of error and hold that the juvenile court's judgment granting HCJFS permanent custody of the children based on Mother's inability to provide the children with a legally-secure permanent placement was not contrary to the weight of the evidence. That evidence revealed that Mother tested positive for methamphetamine months before the hearing, did not distance herself from the M. Children's father ("Father"), and minimized domestic-violence issues in their relationship.

**{¶4}** We affirm the juvenile court's judgment.

### I. Factual and Procedural History

**{¶5}** Mother and her ex-husband, J.A. ("Ex-Husband") have five children together—P.A., A.A., Sa.A., C.A., and Se.A. (collectively, the "A. Children"). Mother and Ex-Husband coparent under a shared-parenting plan, wherein Mother is the A. Children's residential parent. After her divorce from Ex-Husband, Mother married Father and welcomed twins, Ma.M. and Mi.M., in January 2019. Then in 2021, Mother and Father welcomed J.M.

3

## A. HCJFS's custody motions

{¶6} In December 2020, HCJFS filed a complaint and motion for temporary custody or protective supervision of Ma.M. and Mi.M. HCJFS alleged that Ma.M. and Mi.M. were dependent based on Mother's hospital admission for a mental-health emergency while Father was on parole and living in a Talbert-House facility.

{¶7} After a hearing, the magistrate denied HCJFS's request for temporary custody but granted HCJFS protective supervision over Ma.M. and Mi.M. The trial court instructed Mother to (1) follow treatment recommendations, (2) submit to a diagnostic assessment and follow any recommendations, (3) comply with the recommended medication regime, (4) prohibit Father from having unsupervised contact with the children, (5) not be the person to supervise Father with the children, (6) not allow Father to live in the home with the children, (7) sign all release-of-information forms requested by HCJFS, and (8) use protective daycare as required.

{¶8} The magistrate appointed a guardian ad litem ("GAL") for Ma.M. and Mi.M. HCJFS's case plan named Father's drug use and Mother's untreated mental-health issues as areas of concern. In February 2021, the magistrate adjudicated Ma.M. and Mi.M. dependent and extended the protective-supervision order.

{¶9} In June 2021, HCJFS filed a second complaint and motion for temporary custody of Ma.M. and Mi.M. based on allegations of neglect and dependency. It alleged that Father's parole officers found Mother in the house during Father's parenting time, which violated the terms of his parole, and that Father, who had been carrying Mi.M. when officers entered the house, tossed his son to an officer—causing the child to hit the corner of the kitchen counter—and fled the scene. The magistrate granted HCJFS interim custody of Ma.M. and Mi.M. In August 2021, the court adjudicated Ma.M. and Mi.M. dependent for a second time.

{¶10} J.M. was born to Mother and Father in August 2021. Days later, HCJFS sought temporary custody of J.M. In September 2021, the magistrate adjudicated J.M. dependent based on Father's actions during his parole violation. The magistrate supplemented his order with a finding that HCJFS made reasonable efforts to prevent J.M.'s removal through substitute care, visitation, mental-health treatment, protective daycare, and case management. Mother objected to J.M.'s dependency adjudication on manifest-weight grounds, but the juvenile court overruled her objection.

{¶11} The magistrate extended HCJFS's temporary custody of the M. Children, noting that HCJFS expected Mother to "satisfactorily engage in case plan services and demonstrate the necessary behavior change[] before she is reunified with her children." He found that Mother was engaged in "behavioral counseling," consistently visited the M. Children, and had attended some of their therapeutic appointments. But HCJFS believed that Mother's "counseling was not addressing the pattern of behavior between her and [F]ather" and Mother was not consistently attending the M. Children's appointments. The magistrate found that HCJFS had made reasonable efforts to end the continued removal of the M. Children through "substitute care, visitation, counseling, therapeutic services, and caseplan management."

{¶12} Then in November 2022, HCJFS moved for permanent custody of the M. Children under R.C. 2151.413(A) and "a finding that HCJFS made reasonable efforts to eliminate the continued need for the children's removal from their home and that the children's best interests dictates [sic] continued out of home placement." HCJFS alleged in the motion that Mother continued to struggle with mental-health issues, failed "to attend the children's medical and therapy appointments," reduced

her visitation schedule, and did not "learn appropriate interventions and strategies to use when interacting with her children."

{¶13} Ex-Husband moved for custody of the M. Children to allow the M. Children to "live with[] and grow up with their siblings and near other family." The next month, HCJFS filed a complaint and a motion for temporary custody of the A. Children, alleging that some of the A. Children were living with Mother. Relevant here, the magistrate entered protective supervision orders over some of the A. Children and required Mother to undergo random drug screens. Ex-Husband withdrew his petition for custody of the M. Children.

## B. **Permanent-custody hearing**

{¶14} The magistrate held permanent-custody hearings in May, July, and August 2024. HCJFS's case for terminating Mother's parental rights rested on Mother's case-plan progress, mental-health issues and treatment, substance-abuse issues and treatment, visits with the M. Children, and relationship with Father.

{¶15} At the time of the hearings, Mother and Father had been married for six years. In January 2024, Mother had moved into a house owned by her father, where some of the A. Children lived. Mother had a full-time, remote job. Father was in prison during the hearings and most of the time that this case was pending below.

{¶16} The twins were around five years old at the time of the permanent-custody hearings, were set to start kindergarten in August 2024, and had lived with their foster parents for more than two years. Their foster mother testified that the twins were two years old when they were placed with her and were "basically . . . like infants who just laid on their back and cried, had some food insecurities . . . had really low muscle tone, weren't talking." Both twins were diagnosed with global development delay, and Ma.M. was diagnosed with autism spectrum disorder. The twins have

6

received physical, occupational, speech, and feeding therapy while in foster care. At the time of the hearings, Ma.M. had four appointments and Mi.M. had three appointments each week.

{¶17} J.M. was placed into foster care days after he was born in August 2021 and was almost three years old when the hearings began. J.M.'s foster mother testified that J.M.'s shoulder was injured during birth and he was "slow to use his limbs." J.M. was diagnosed with hypotonia, global development delay, sensory processing disorder, and autism spectrum disorder. J.M. has weekly occupational, feeding, and sensory-therapy appointments, and will need "ABA therapy."

1. Mother's progress with case-plan services

{¶18} Mother completed two diagnostic assessments of functioning ("DAFs") in 2020 and 2023. Her first DAF assessor recommended that HCJFS offer Mother "parental programs that would include information on how to help kids with developmental disabilities." Mother testified that HCJFS did not offer that service. In 2023, her DAF assessor recommended that HCJFS provide Mother with outpatient substance-abuse treatment, random drug screens, individual counseling, and pharmacological management. And her assessor suggested that HCJFS offer Mother parenting support and education for parents of children with developmental delays and Nar-Anon as beneficial services.

{¶19} Mother testified that HCJFS ignored those suggestions. As part of Mother's case plan, HCJFS coordinated her mental-health treatment and visitation with the children through Family Nurturing Center ("FNC"). Later, HCJFS provided drug screens. Eventually, a Caseworker[1] referred Mother for a parenting evaluation.

---

[1] Numerous HCJFS employees worked on the family's case, supervised caseworkers, and testified at the hearings. We refer to HCJFS employees overseeing the family's case as "Caseworker(s)."

**{¶20}** Mother routinely met with her Caseworkers. She recalled repeatedly asking them "what they wanted to see" from her to allow her to regain custody of her children. According to Mother, HCJFS and the Caseworkers did not set concrete goals, so Mother attended a host of parenting and trauma classes at Beech Acres. Mother testified that she implements the lessons she learned from those classes and what she has learned from her children's therapy appointments.

### i. *Visitation and the children's appointments*

**{¶21}** Initially, Mother resisted suggestions about the M. Children's needs and doubted the need for their appointments to address their special needs. At first, she arrived at the end of her children's appointments. In 2022, HCJFS told Mother they wanted her to attend more consistently. Eventually, Mother was engaged with the children's therapy appointments and HCJFS was satisfied with her attendance. Sometimes, Mother's work schedule conflicted with the children's appointments. Mother testified that, if the juvenile court returned the children to her custody, she would schedule the children's appointment to a facility closer to her home. And with the help of her support network, she expected no issues with her children's appointments.

**{¶22}** Mother's visits with the children first occurred at Family Nurturing Center ("FNC"), with supervision. In 2022, visits transitioned to Mother's home. Caseworkers were initially concerned about cleanliness in Mother's house, but she was receptive to feedback. A Caseworker described Mother as attentive and receptive to her children.

**{¶23}** An FNC employee supervised Mother's visits with the M. Children from November 2022 to March 2024. She testified that Mother was receptive to feedback and had no concerns with Mother's parenting. The FNC employee also testified that

the children's transition from Mother to their foster parents after visits were "long and drawn out" because the foster parents lingered in Mother's home "looking around the house" and "trying to find things wrong that were not necessarily a problem, which would lead to "complaints about the house" and "other things that were going on."

### ii. *Mother's mental health*

{¶24} Mother had anxiety and received mental-health treatment before this case began. Mother testified that, during the COVID-19 pandemic, she began having panic attacks because she was "isolated and living alone with the twins." She called police, arranged childcare, and went to the hospital for psychiatric treatment, which led to the "twins [being] removed into foster care on that day." Sa.A., Mother's teenage son, testified that Mother was "very distressed" in 2021 and not "in a great state of mind" after HCJFS removed Ma.M. and Mi.M.

{¶25} As part of her case plan, Mother began therapy in 2020. Caseworkers testified that Mother consistently attended her mental-health treatment. Mother and her Caseworkers testified that Father's substance abuse and his behaviors were a trigger for Mother. Mother worked on her own substance-abuse issues and her boundaries with Father in therapy. According to Sa.A., Mother is currently "more composed," "more empathetic," and is selfless.

{¶26} In August 2022, Mother admitted herself to Becket Springs, an inpatient mental-health-treatment facility in Cincinnati, Ohio. After her inpatient stay, she engaged in outpatient treatment. The Beckett Springs admission packet reveals that Mother reported having suicidal thoughts. But she was deemed "stable" when she was discharged ten days later. At the hearing, Mother adamantly denied being suicidal or reporting thoughts of suicide to Beckett Springs.

**{¶27}** Caseworkers testified that Mother did not apply what she learned in therapy. HCJFS wanted to see that Mother could "parent as well as addressing . . . the mental health, being able to self-protect, protect herself, protect her children, being able to identify . . . triggers and . . . appropriate responses to those." Another Caseworker testified that Mother's therapist reported that Mother was making progress. While Mother followed HCJFS's therapy requirements, a Caseworker testified that the mental-health component of Mother's case plan was incomplete because the agency had not seen changes in Mother's behavior or in her involvement with Father.

### iii. *Mother's substance-use issues*

**{¶28}** Mother testified that she had used marijuana, and occasionally cocaine, in the past. In 2019, she tried methamphetamine. According to Mother, she used methamphetamine semi-regularly by the spring of 2022. By summer, she was using methamphetamine every day to "deal with the trauma" caused by HCJFS's removing her children and the death of a family member. Her daily methamphetamine use continued for three months, until her "life became unmanageable" and she sought treatment at Beckett Springs.

**{¶29}** Mother checked herself into Beckett Springs and participated in inpatient substance-abuse treatment. During her ten-day stay, Mother realized that she was a "drug addict" and "at risk of drug use anytime [she's] around someone who's using." After her stay, Mother began outpatient treatment, which was three-hour-long sessions, three days each week. But she discontinued that intensive outpatient-treatment program when its demands threatened her employment. At the time of trial, Mother participated in "Sober Recovery," a support group with weekly meetings.

**{¶30}** Mother testified that after she left Beckett Springs, she continued using methamphetamine. In February 2023, Mother tested positive for drugs and admitted to her drug use. She testified that she had maintained sobriety since February 2023. After that failed drug test, Mother routinely tested negative for drugs. A Caseworker believed Mother was "doing really well," "demonstrating sobriety," and prioritizing her children, so HCJFS recommended expanding Mother's visitation rights.

**{¶31}** But Mother's hair follicles tested positive for methamphetamine twice in October 2023 and once in January 2024. Along with Mother, Caseworkers and case-plan providers were confused by the positive test results. Mother's therapist, Caseworkers, and FNC visitation facilitator did not see evidence in Mother's behavior that she was using drugs at the time.

**{¶32}** At the hearings, Mother testified that she had driven a truck that Father had used to smoke methamphetamine sometime around September 2023. She theorized that her hair was exposed to methamphetamine residue in the interior of the truck, which caused her follicles to test positive for methamphetamine. But during a meeting before a visit between Mother and the children, Mother told the FNC visitation facilitator that the hair-follicle test result "was correct, and that she did mess up, and she knows that [] she did, and she was gonna move forward."

**{¶33}** A Talbert House employee treated Mother during her intensive outpatient program and then as Mother's individual therapist. Mother completed and graduated from an outpatient drug-treatment program. The therapist worked with Mother on her relationship with Father and her sobriety. In the therapist's view, Mother had "drastically improved her relationship . . . with sober support." Mother's progress in her drug-treatment program was "very significant," and she was "in sustained remission."

### iv. *Mother's relationship with Father*

**{¶34}** As of May 2024, Father had been incarcerated for one year because, in his words, "I'm a drug addict and I made bad decisions." Father's criminal history includes a child-endangerment conviction related to throwing Mi.M. at his parole officer, "bail jumping," probation violations, and felony drug possession. While Father was scheduled for release in July 2025, additional charges were pending against him. Father testified that Mother encouraged him to better himself in prison, so he enrolled himself in "numerous programs" for substance abuse and domestic violence and left the Aryan Brotherhood. Because of his good behavior, the prison moved Father to minimum-security housing.

**{¶35}** Mother described her relationship with Father as "toxic," but denied any domestic violence in their relationship. Father, like Mother, denied any domestic violence in their relationship. Mother defined domestic violence as dominance and control that "can include physical violence." But she testified that she and Father had "gotten physically assertive with one another," had "thrown things," and had "broken things" when arguing. And Father had "probably" slapped Mother.

**{¶36}** Mother's Beckett Springs admission paperwork states that Mother was "covered in bruises with two black eyes, swollen face, [and had] wounds on her arms and face" in August 2022. She told employees that her injuries "were from her husband, who dropped her off at the facility." But Mother testified that Father did not cause her injuries, and instead attributed the injuries to being clumsy, an iron deficiency, and having gone camping before her admission to Beckett Springs.

**{¶37}** A Caseworker testified that Father manipulated and controlled Mother. She recalled that Mother had called the police because of Father's drug-induced aggression. Once, Father stole Mother's phone and prevented her from taking a drug

test. In the fall of 2022, Father reported to a Caseworker that Mother "might be using" drugs. Father testified that he reported Mother because he was "on the run" and Mother had "shunned" him.

**{¶38}** Caseworkers testified that Mother had described Father as a trigger for her mental-health and substance issues. Indeed, Mother initially testified that Father convinced her to take methamphetamine. Later in her testimony, she said it was her decision. Mother clarified that Father "himself, is not a trigger" for Mother's drug use or mental-health issues; instead, her trigger "is his drug use."

**{¶39}** Mother testified that through therapy, she has learned to set boundaries with Father and believes that in the fall of 2023 she had set the boundaries that HCJFS wanted to see. She had stopped talking to him and demanded that he improve himself before she would even consider visiting or talking to him. Mother testified that her boundaries with Father involved "when he is not doing well." In those instances, Mother would not "engage with [him]" and "cut[s] off communication." Mother testified that Father "attempted to control" her in the past, but "[h]e doesn't have any access to" her finances, job, or family as leverage for control.

**{¶40}** After Father completed substance-abuse and parenting classes in prison, Mother began visiting and speaking with Father regularly. Mother explained that she reengaged with Father because her "sons are his sons, and what he does with his life at any point in his life is going to affect them." So, she wanted to offer Father "support and positive reinforcement for the [positive] things that he's doing." Moreover, she deposits roughly "$100, $150 a month" into Father's commissary.

**{¶41}** Father initially testified that he wanted to continue his relationship with Mother. He recalled that she had raised the prospect of a divorce at one point. But Father persuaded her to not file for divorce and insisted he would refuse to sign any

divorce paperwork. Mother disagreed that Father had talked her out of filing for divorce. She testified that she intends to file for divorce and has "no plans" to "continue a relationship with [Father] at all" after his release. Later Father testified that after he is released from prison, he would not rely on Mother for housing because he and Mother are "not together, and it would hurt [his] sons."

{¶42} Caseworkers saw evidence that Mother, at one point, did set boundaries with Father. But according to one Caseworker, Mother was not "able to keep the children safe" when Father was around, and the domestic-violence incidents occurred when Father was out of prison. Caseworkers cited the "thousands" of calls between Mother and Father when he was in prison as proof that Mother had not set firm boundaries in her relationship with Father.

{¶43} A new therapist began providing Mother family and individual therapy in February 2024. HCJFS's referral guided the scope of Mother's therapy. The therapist testified, "there didn't appear to be a right-there-in-the-moment concern for domestic violence" and HCJFS did not refer Mother to domestic-violence counseling. The therapy focused on Mother's boundaries with Father, and the therapist believed that Mother felt safe communicating and visiting with Father while he was in prison because the calls "are recorded and . . . it's a controlled environment when she sees him." Mother discussed "her expectation for when [Father]" would be released from prison and "she didn't have a plan to have any relations with [Father]." Mother's previous therapist also testified that Mother had dramatically improved her boundaries with Father and limited her contact with him.

{¶44} Mother's friends and her addiction-recovery sponsor testified that Mother went months without speaking with Father and had set firm boundaries with him. Mother's sponsor testified that Mother had considered seeking a protection order

against Father, and that divorce is still an option for Mother. Mother's sponsor believed that Mother had protective measures in place to protect her children.

## C. **The juvenile court's decision**

**{¶45}** The magistrate granted HCJFS's motion for permanent custody because the M. Children had been in HCJFS's temporary custody for more than 12 months of a consecutive 22-month period under R.C. 2151.414(B)(1)(d) and permanent custody was in the children's best interest under R.C. 2151.414(D)(1). Mother objected, arguing that the magistrate's decision was not supported by sufficient evidence and was contrary to the weight of the evidence, the findings were contrary to law, and HCJFS did not make reasonable efforts to provide Mother with the opportunity to reunify with her children. The juvenile court overruled Mother's objections, adopted and supplemented the magistrate's findings, terminated Mother's parental rights, and awarded permanent custody of the M. Children to HCJFS.

## II. *Analysis*

**{¶46}** Mother raises two assignments of error. First, she argues that the juvenile court erred when it found that HCJFS had made reasonable efforts to assist Mother in remedying the issues that caused her children's removal. Second, she asserts that the juvenile court's best-interest findings were contrary to the manifest weight of the evidence.

## A. **The juvenile court was not required to make a reasonable-efforts finding when considering HCJFS's permanent-custody motion**

**{¶47}** Mother disputes the evidence supporting the juvenile court's finding of reasonable efforts, citing R.C. 2151.419. She argues that the record demonstrates that HCJFS's services were neither reasonable nor diligent. She cites the fact that HCJFS knew the A. Children were living with Mother. And while the A. Children were safe,

secured, and nurtured, HCJFS "failed to take steps to reintegrate the children at issue back into Mother's home."

**{¶48}** Generally, "the state must make reasonable efforts to reunify the family before terminating parental rights." *In re C.F.*, 2007-Ohio-1104, ¶ 4. Multiple Ohio statutes require a child-services agency to make reasonable efforts to reunify the family when the agency seeks or maintains custody of a child. To satisfy this duty, the agency "'"must act diligently and provide services appropriate to the family's need to prevent the child's removal or as a predicate to reunification."'" *In re D.D.*, 2023-Ohio-4147, ¶ 20 (10th Dist.), quoting *In re H.M.K.*, 2013-Ohio-4317, ¶ 95 (3d Dist.), quoting *In re D.A.*, 2012-Ohio-1104, ¶ 30 (6th Dist.).

**{¶49}** Mother's reasonable-efforts argument focuses on R.C. 2151.419(A)(1). That statute instructs the juvenile court to decide whether an agency "has made reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home." R.C. 2151.419(A)(1).

**{¶50}** The reasonable-efforts determination must be made after a "hearing held pursuant to [R.C.] 2151.28, . . . 2151.31[(E)], or . . . 2151.314, 2151.33, or 2151.353 . . . at which the court removes a child from the child's home or continues the removal of a child from the child's home." *Id.* Accordingly, R.C. 2151.419(A)(1) requires a juvenile court to make a reasonable-efforts determination after "adjudicatory, emergency, detention, and temporary-disposition hearings, and dispositional hearings for abused, neglected, or dependent children, all of which occur prior to a decision transferring permanent custody to the state." *In re C.F.* at ¶ 41.

**{¶51}** So, while the State must make reasonable efforts to reunify the family during child-custody proceedings at some point before the court terminates parental

rights, the child-services agency must prove that it made such reasonable efforts at a permanent-custody hearing only if it had "not [already] established that reasonable efforts have been made prior to the hearing on a motion for permanent custody." *In re C.F.*, 2007-Ohio-1104, at ¶ 43. In cases where an agency has demonstrated earlier in the proceedings that it made reasonable efforts, the reasonable-efforts statute, "R.C. 2151.419(A)(1)[,] does not apply in a hearing on a motion for permanent custody filed pursuant to R.C. 2151.413." *Id.* at ¶ 43; *see also In re S Children*, 2024-Ohio-538, ¶ 42 (1st Dist.) ("R.C. 2151.419(A) requires a reasonable-efforts finding in a *dispositional* hearing after an adjudication of abuse, neglect, or dependency.").

**{¶52}** HCJFS sought permanent custody of the M. Children under R.C. 2151.413(A). Before the permanent-custody hearing, three entries—the disposition order and two continuance entries—contained findings that HCJFS had made "reasonable efforts to eliminate the continued removal from the home and make it possible for the child[ren] to return home by provision of the following services: substitute care, visitation, counseling, therapeutic services, and case management." Mother did not object to those findings. And by failing to object to the magistrate's reasonable-efforts findings, Mother forfeited all but plain error on appeal under Juv.R. 40(D)(3)(b)(iv). *See In re L.D.*, 2024-Ohio-4888, ¶ 18 (1st Dist.); *see also In re De.R.*, 2024-Ohio-1183, ¶ 18 (1st Dist.). We will not find plain error unless the trial court committed an error that "'seriously affects the basic fairness, integrity, or public reputation of the judicial process[.]'" *In re J.W.*, 2019-Ohio-2730, ¶ 7 (1st Dist.), quoting *In re Etter*, 134 Ohio App.3d 484, 492 (1st Dist. 1998).

**{¶53}** The juvenile court did what the statute requires—it determined during the proceedings that HCJFS made reasonable efforts to reunite the family. And because HCJFS demonstrated its reasonable efforts earlier in the proceedings, R.C.

17

2151.419(A)(1) was inapplicable at the "hearing on a motion for permanent custody filed pursuant to R.C. 2151.413." *In re C.F.* at ¶ 43.

**{¶54}** Mother did not object to the magistrate's reasonable-efforts findings and does not suggest that those findings amount to a plain error. As such, we need not consider whether the juvenile court plainly erred. *See Burd v. Artis,* 2025-Ohio-625, ¶ 11 (1st Dist.). Moreover, the transcripts of those earlier proceedings that resulted in the reasonable-efforts findings are not in the record on appeal, which would prevent us from reviewing those findings. *See In re B.H.,* 2021-Ohio-4152, ¶ 23 (9th Dist.).

**{¶55}** We overrule Mother's first assignment of error because the juvenile court did not have to make a reasonable-efforts finding when considering HCJFS's R.C. 2151.413 permanent-custody motion because HCJFS was found to have made reasonable efforts at earlier stages in the proceedings.

## B. The evidence supports the juvenile court's best-interest findings

**{¶56}** In her second assignment of error, Mother argues that the trial court's determination that awarding permanent custody of the M. Children to HCJFS is in their best interests is contrary to the manifest weight of the evidence.

**{¶57}** Mother, like all parents, has a "fundamental liberty interest . . . in the care, custody, and management of [her] child[ren]." *Santosky v. Kramer,* 455 U.S. 745, 752 (1982). Indeed, a "parent's 'desire for and right to "the companionship, care, custody, and management of his or her children"' is an interest far more precious than any property right." *Id.* at 756, quoting *Lassiter v. Dept. of Social Servs.,* 452 U.S. 18, 27 (1981), quoting *Stanley v. Illinois*, 405 U.S. 645, 651 (1972). Terminating those parental rights is considered "the family-law equivalent of the death penalty in a criminal case." *In re M Children,* 2019-Ohio-484, ¶ 13 (1st Dist.). Consequently, permanently terminating parental rights is proper only as a measure of last resort and

18

when necessary to protect the welfare of the children. *See In re T.L.*, 2019-Ohio-4919, ¶ 17 (7th Dist.). In other words, terminating parental rights is "only justified when it is in the 'best interests' of the child." *In re Cunningham,* 59 Ohio St.2d 100, 105 (1979).

**{¶58}** Under R.C. 2151.414(B)(1), the juvenile court may grant a child-services agency permanent custody of a child if it finds "'by clear and convincing evidence, that it is in the best interest of the child' to do so and that one of five factors enumerated in R.C. 2151.414(B)(1)(a) through (e) applies." *In re Z.C.*, 2023-Ohio-4703, ¶ 7. Clear and convincing evidence "produce[s] in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, (1954), paragraph three of the syllabus. Clear and convincing evidence is a higher burden of persuasion than the preponderance-of-evidence standard in most civil cases, but a lesser burden than the beyond-a-reasonable-doubt standard in criminal cases. *Id.*

**{¶59}** A manifest-weight challenge requires us to review the record, weigh the evidence and reasonable inferences, appraise witness credibility, and determine whether the trial court clearly lost its way, creating "a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.'" *In re Z.C.* at ¶ 14, quoting *Eastley v. Volkman,* 2023-Ohio-2179, ¶ 20. Appellate courts must remain "'mindful of the presumption in favor of the finder of fact'" when reviewing the weight of the evidence. *Id.*, quoting *Eastley* at ¶ 21.

**{¶60}** When considering an R.C. 2151.413(A) permanent-custody motion, the juvenile court must consider the following factors, along with any other relevant factors, when deciding if permanent custody is in the best interests of the child:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers,

and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child . . . ;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1).

**{¶61}** When analyzing the best interest of a child, "no single factor is controlling, and the weight to be given to any factor lies within the trial court's discretion." *In re L.L.*, 2020-Ohio-5609, ¶ 8 (1st Dist.).

**{¶62}** Here, the magistrate's best-interest analysis focused on the children's interactions and interrelationships, their custodial history, and their need for a legally secure permanent placement. *See* R.C. 2151.414(D)(1)(a), (c), and (d). The juvenile court adopted and supplemented those findings.

**{¶63}** Mother does not challenge the juvenile court's findings that the M. Children are bonded to Mother, their foster parents, and to "some degree" the A. Children. Mother also does not challenge the juvenile court's findings that Ma.M. and Mi.M. were removed from Mother's care in June 2021, that J.M. was removed from Mother's care in August 2021, or that the three were adjudicated dependent.

**{¶64}** Rather, Mother's manifest-weight argument focuses on the juvenile court's analysis of the children's need for a legally secure permanent placement, which

"'encompasses a stable environment where a child will live in safety with one or more dependable adults who will provide for the child's needs.'" *In re Z.F.*, 2024-Ohio-1698, ¶ 45 (1st Dist.), quoting *In re M.B.,* 2016-Ohio-793, ¶ 56 (4th Dist.). As Mother points out, the magistrate's and juvenile court's discussions of the M. Children's need for legally secure permanent placements include multiple findings and an extensive discussion of the evidence.

{¶65}   Ohio courts have held that a parent's inability to create distance from an abusive partner supports a finding that the parent cannot provide a legally secure permanent placement. *See In re H.C.*, 2025-Ohio-3010, ¶ 33 (4th Dist.) (collecting cases). Moreover, courts have held that when a parent struggling with addiction does not adequately address their substance-abuse issues, a juvenile court could consider that parent's home unsafe or legally unsecure. *See In re B.M.*, 2017-Ohio-3892, ¶ 55 (4th Dist.); *see also In re J. Children,* 2025-Ohio-1430, ¶ 32 (1st Dist.).

{¶66}   The magistrate found that Mother did not demonstrate that she can remain sober and remove herself from unhealthy relationships. The magistrate was "not persuaded that the concerns related to Mother's substance abuse have been remedied" and remained "concerned that she has not made the behavioral changes necessary to gain insight into the nature of her addiction nor been able to maintain sobriety, despite her engagement in treatment services." Moreover, "Mother enabled Father" and there "was a consistent pattern of Father abusing substances, becoming incarcerated, being released from incarceration, Mother continuing to enable his lifestyle, which then led to the continued cycles of his use and incarceration." The magistrate found that Mother minimized the domestic-violence issues, and her testimony was not credible.

**{¶67}** The juvenile court also found that Mother did not show behavioral changes necessary to remedy the issues surrounding her relationship with Father and substance use, citing Mother's phone calls with Father and admission that the hair-follicle tests were "correct" and she "did mess up."

**{¶68}** Mother argues that these findings ignore the evidence of Mother's progress and sobriety. She cites a psychological exam that she underwent in August 2023, which acknowledged her progress in sobriety, mental health, and understanding her children's needs. But Mother tested positive for methamphetamine *after* that evaluation, in October 2023 and January 2024. And then Mother admitted that the hair-follicle test results were correct.

**{¶69}** Mother also cites contradictory statements by Caseworkers and the GAL about their knowledge of the A. Children's presence in Mother's home as evidence that the Caseworkers and GAL lack credibility. But the evidence surrounding Mother's relationship with Father and substance-use issues was credible. The magistrate found that Mother's testimony lacked credibility, and Mother has not explained why the juvenile court should have departed from that credibility finding.

**{¶70}** We note that evidence exists that Mother had taken steps to set boundaries and distance herself from Father and has made strides in her recovery from substance abuse, despite the positive tests. *See State v. Davis,* 2017-Ohio-8479, ¶ 13 (8th Dist.) (recognizing that "relapse is an extremely common, and often inevitable, aspect of recovery from drug addiction."). But the evidence showed that Mother's insistence that the hair-follicle tests were false positives was dishonest. And the juvenile court correctly noted that Mother minimized the domestic-violence issues in her relationship and kept Father in her life. Indeed, Mother was arrested for domestic violence against Father at one point and Mother sought to use photos of

bruises and injuries as evidence for a temporary restraining order against Father.

**{¶71}** On this record, we cannot say that the juvenile court's decision to grant HCJFS permanent custody of her children was contrary to the manifest weight of the evidence. We overrule Mother's second assignment of error.

### III. Conclusion

**{¶72}** We overrule the two assignments of error and affirm the juvenile court's judgment awarding HCJFS permanent custody of the M. Children.

Judgment affirmed.

**CROUSE, J.,** concurs.
**KINSLEY, P.J.,** concurs separately.

**KINSLEY, P.J.,** concurring separately.

**{¶73}** I concur with the majority's resolution of Mother's assignments of error. I write separately, however, to address what I perceive as confusion by the parties as to the applicable legal standards governing the permanent custody inquiry. The guardian ad litem argued that the central issue in this case pertains to Mother and Father's "behavioral changes." Similarly, HCJFS argued that the children should be removed from Mother's care because she failed to remedy the conditions in her home that caused the children's removal. Neither of these contentions accurately reflect the R.C. 2151.414(D)(1) best-interest factors that apply when a child has been in the custody of HCFJS for 12 of 22 consecutive months, as the M. Children were. Given that parental termination is the family law equivalent of the death penalty, and given the serious impacts that occur when the law remakes families, greater precision is warranted in applying the parental termination standards to the M. Children. *In re M. Children*, 2019-Ohio-484, ¶ 13 (1st Dist.).

{¶74} The law requires a two-step inquiry before children can be removed from the custody of their biological parents. First, the child must be eligible for an award of permanent custody by satisfying one of the criteria in R.C. 2151.414(B)(1). *In re X.M.W.*, 2020-Ohio-449, ¶ 9 (1st Dist.). These criteria include (1) that the child cannot or should not be placed with either parent within a reasonable period of time, (2) that the child is abandoned or orphaned, (3) that the child or another child of the same parent has been adjudicated abused, neglected, or dependent three times, or (4) that the child has been in the temporary custody of HCJFS for 12 or more months of a consecutive 22-month period. R.C. 2151.414(B)(1)(a)-(e). In determining whether a child cannot or should not be placed with her parents under R.C. 2151.414(B)(1)(a), courts are to consider all relevant evidence. R.C. 2151.414(E). Fifteen enumerated conditions require the juvenile court to conclude that this criterion has been met, including when a parent fails to remedy the conditions that caused the child to be removed from the parent's home. R.C. 2151.414(E)(1).

{¶75} Once a child has been determined to be eligible for permanent custody under R.C. 2151.414(B)(1), the juvenile court must assess whether an award of permanent custody is in the child's best interest. *In re X.M.W.* at ¶ 9. This inquiry requires the juvenile court to take into consideration a number of factors about the child's relationships, wishes, custodial history, and "need for a legally secure placement." R.C. 2151.414(D)(1). In ascertaining a child's best interest, the juvenile court is also directed to consider five of the sixteen conditions that indicate whether a child cannot or should not be placed with her parents. R.C. 2151.414(D)(1)(e) (incorporating R.C. 2151.414(E)(7) to (11) into a permanent custody best-interest determination). But the inquiry into whether a parent has remedied the conditions that caused the child to be removed from the parent's home is not among the five

conditions that the statute incorporates at the best-interest stage. *Id.* Thus, under Ohio's parental termination scheme, the relevance of a parent's failure to remedy the conditions that caused a child to be removed from the home is cabined to cases in which a child cannot or should not be placed with that parent. *Id.*

{¶76} Nonetheless, the parties' briefs in this case, as well as several of the magistrate's custody orders, focused on whether Mother demonstrated sufficient "behavioral change" to retain custody of her children. But "behavioral change" is not a legal standard. It appears nowhere in the Revised Code sections governing parental termination. As a term, it is incredibly vague, in that it does not specify what precisely a parent is to do or accomplish. What is worse, it is objectively immeasurable, leaving the decision as to whether a parent has sufficiently reformed to the discretion of HCJFS.

{¶77} To the extent a parent's inability to overcome previous struggles is relevant to the parental termination calculus, it may come into play, if at all, in determining whether a parent remedied the conditions that necessitated removal under R.C. 2151.414(E)(1). But that factor only applies to cannot-or-should-not-place cases under R.C. 2151.414(B)(1)(a), not 12-in-22 cases under R.C. 2151.414(B)(1)(d). As this case is of the latter variety, the factor simply does not apply.

{¶78} Evidence about a parent's ability to provide for a child's needs and wellbeing is therefore more properly admitted under the "legally secure placement" factor at the best-interest stage. A legally secure placement is a safe, stable, and consistent environment where a child's needs will be met. *In re R.R.*, 2023-Ohio-2575, ¶ 35 (6th Dist.). A juvenile court may need to consider a wider range of information than merely the conditions which caused removal of the child to determine a parent's ability to provide this environment to a child. For example, a child may have been

removed from the home due to a parent's substance abuse disorder, but the parent may also be currently unable to provide a safe and secure environment due to the presence of a dangerous adult in the residence.

**{¶79}** This is in fact what occurred here. The condition that led to the removal of Mother's children was, sadly, her need for emergency mental health intervention. If the parties and the juvenile court focus solely on whether she remedied that condition under R.C. 2151.414(E)(1), she undoubtedly did. The record reveals that Mother no longer suffered from suicidal ideation at the time of the permanent custody trial and no longer needed in-patient mental health support.

**{¶80}** But focusing on this factor, which is not statutorily required for 12-in-22 cases like this one, has a distorting effect as to whether Mother could provide a legally secure environment for her children. When focusing on this much broader criterion under R.C. 2151.414(D)(1)(d), the evidence presented at the permanent custody trial went beyond Mother's then-current mental health status. It also indicated that Mother had recently relapsed into substance abuse and could not ensure the children's safety from Father, who had been physically abusive to her. Despite the clear progress Mother made in other areas of her life, I agree with the majority's conclusion that this evidence demonstrated Mother's inability to provide a legally secure placement for her children. I reach this conclusion solely by reference to R.C. 2151.414(D)(1)(d) and not by weighing any ambiguous reference to Mother's "behavioral changes," whatever that might mean.